**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

TONY KORAB; TOJIO CLANTON;
KEBEN ENOCH, each individually
and on behalf of those persons
similarly situated,

*Plaintiff-Appellees*,

v.

KENNETH FINK, in his official
capacity as State of Hawai'i,
Department of Human Services,
Med-QUEST Division Administrator
and PATRICIA MCMANAMAN, in her
official capacity as Director of the
State of Hawai'i, Department of
Human Services,

*Defendants-Appellants*.

No. 11-15132

D.C. No.
1:10-cv-00483-
JMS-KSC

OPINION

Appeal from the United States District Court
for the District of Hawai'i
J. Michael Seabright, District Judge, Presiding

Argued and Submitted
September 18, 2012—San Francisco, California

Filed April 1, 2014

Before: M. Margaret McKeown, Richard R. Clifton, and
            Jay S. Bybee, Circuit Judges.

Opinion by Judge McKeown;
Concurrence by Judge Bybee;
Dissent by Judge Clifton

## SUMMARY[*]

### Civil Rights/Medicaid

The panel vacated the district court's grant of a preliminary injunction in a class action suit brought on behalf of nonimmigrant aliens residing in Hawai'i under a Compact of Free Association with the United States who alleged that Hawai'i's new health plan, Basic Health Hawai'i, violated the Equal Protection Clause of the Fourteenth Amendment because it provided them with less health coverage than what Hawai'i provided to citizens and qualified aliens who were eligible for federal reimbursements through Medicaid.

The panel noted that in enacting comprehensive welfare reform in 1996, Congress rendered various groups of aliens ineligible for federal benefits and also restricted states' ability to use their own funds to provide benefits to certain aliens. *See* 8 U.S.C. § 1601 et seq. The panel held that Hawai'i has no constitutional obligation to fill the gap left by Congress's withdrawal of federal funding under the cooperative-state-federal Medicaid plan. The panel therefore vacated the

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

district court's grant of a preliminary injunction preventing Hawai'i from reducing state-paid health benefits for nonimmigrant aliens residing in Hawaii under the Compact, holding that Hawai'i was not obligated to backfill the loss of federal funds with state funds and its decision not to do so was subject to rational-basis review.

Concurring and concurring in the judgment, Judge Bybee wrote separately to explain why the law of alienage remains so unclear and how the court might better approach it. Judge Bybee wrote that the equal protection principle announced in *Graham v. Richardson*, 403 U.S. 365, 375 (1971), has proven unsustainable. He would adopt a preemption analysis as the appropriate analysis for evaluating alienage cases.

Dissenting, Judge Clifton wrote that the federal government is permitted to discriminate against aliens in a way that the state government is not and that established precedent required the court to apply strict scrutiny to Hawai'i's exclusion of the plaintiff class from the Medicaid programs.

---

## COUNSEL

Lee Ann N.M. Brewer (argued) and John F. Molay, Deputy Attorneys General, Honolulu, Hawai'i for Defendant-Appellant.

Paul D. Alston (argued), Zachary A. McNish, and J. Blaine Rogers, Alston, Hunt, Floyd, & Ing, Honolulu, Hawai'i; Catherine Leilani Aubuchon and Margery S. Bronster, Bronster Hoshibata, Honolulu, Hawai'i; M. Victor

Geminiani, Lawyers for Equal Justice, Honolulu, Hawai'i, for Plaintiffs-Appellees.

Susan K. Serrano, Honolulu, Hawai'i for Amici Curiae Japanese American Citizens League–Honolulu Chapter, National Association for the Advancement of Colored People–Honolulu Branch, and Kokua Kalihi Valley Comprehensive Family Services.

**OPINION**

McKEOWN, Circuit Judge:

This case presents yet another challenge to the complex area of state-funded benefits for aliens. In enacting comprehensive welfare reform in 1996, Congress rendered various groups of aliens ineligible for federal benefits and also restricted states' ability to use their own funds to provide benefits to certain aliens. *See* 8 U.S.C. § 1601 et seq. As a condition of receiving federal funds, Congress required states to limit eligibility for federal benefits, such as Medicaid, to citizens and certain aliens. For state benefits, such as the Hawai'i health insurance program at issue here, Congress essentially created three categories of eligibility. The first category—full benefits—requires states to provide the same benefits to particular groups of aliens, including certain legal permanent residents, asylees, and refugees, as the state provides to citizens. *Id.* § 1622(b). Recipients in this category also benefit from federal funds. *Id.* § 1612(b)(2). The second category—no benefits—prohibits states from providing any benefits to certain aliens, such as those who are in the United States without authorization. *Id.* § 1621(a). The third category—discretionary benefits—authorizes states

to determine the eligibility for any state benefits of an alien who is a qualified alien, a nonimmigrant, or a parolee. *Id.* § 1622(a).

Within the third category are nonimmigrant aliens residing in Hawai'i under a Compact of Free Association with the United States, known as COFA Residents.[1] Although this group was not eligible for federal reimbursement under the cooperative state-federal Medicaid plan, Hawai'i initially included them in the state health insurance plans at the same level of coverage as individuals eligible for federal reimbursement under Medicaid, and Hawai'i assumed the full cost of that coverage. Then, in the face of declining revenues, in 2010 Hawai'i dropped COFA Residents from its general health insurance plans and created a new plan with more limited coverage—Basic Health Hawai'i—exclusively for COFA Residents and legal permanent residents who have lived in the United States for less than five years. Haw. Code R. § 17-1722.3-1. Hawai'i did not adopt a plan for other aliens excluded from federal coverage under the third category.

In this class action suit on behalf of adult, non-pregnant COFA Residents, Tony Korab, Tojio Clanton, and Keben Enoch (collectively "Korab") claim that Basic Health Hawai'i violates the Equal Protection Clause of the Fourteenth

---

[1] The Republic of the Marshall Islands, the Federated States of Micronesia, and the Republic of Palau have each entered into a Compact of Free Association ("COFA") with the United States, which, among other things, allows their citizens to enter the United States and establish residence as a "nonimmigrant." Compact of Free Association Act of 1985, Pub. L. No. 99-239, 99 Stat. 1770 (1986), *amended by* Compact of Free Association Amendments Act of 2003, Pub. L. No. 108-188, 117 Stat. 2720; *see also* 48 U.S.C. § 1901 (joint resolution approving the COFA).

Amendment because it provides less health coverage to COFA Residents than the health coverage that Hawai'i provides to citizens and qualified aliens who are eligible for federal reimbursements through Medicaid. Korab does not challenge the constitutionality of the federal law excluding COFA Residents from federal Medicaid reimbursements. Rather, the claim is that the prior, more comprehensive level of state coverage should be reinstated so that COFA Residents are on equal footing with those covered by Medicaid.

We are sympathetic to Korab's argument but cannot accept the rationale. The basic flaw in the proposition is that Korab is excluded from the more comprehensive Medicaid benefits, which include federal funds, as a consequence of congressional action. Congress has plenary power to regulate immigration and the conditions on which aliens remain in the United States, and Congress has authorized states to do exactly what Hawai'i has done here—determine the eligibility for, and terms of, state benefits for aliens in the narrow third category, with regard to whom Congress expressly gave states limited discretion. Hawai'i has no constitutional obligation to fill the gap left by Congress's withdrawal of federal funding for COFA Residents.

The district court thought otherwise. As Hawai'i put it in its brief, "the district court ruled that the [Hawai'i] Department [of Human Services] is constitutionally required to set up a state-only funded program that completely 'fills the void' created by the Federal Welfare Reform Act's discrimination against aliens." We vacate the district court's grant of a preliminary injunction preventing Hawai'i from reducing state-paid health benefits for COFA Residents because Hawai'i is not obligated to backfill the loss of federal

funds with state funds and its decision not to do so is subject to rational-basis review.

BACKGROUND

I.   THE WELFARE REFORM ACT AND ALIENS

As part of welfare policy reforms enacted in 1996, Congress passed the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 ("the Welfare Reform Act" or "the Act"). Pub. L. 104-193, 110 Stat. 2105 (1996). Title IV of the Welfare Reform Act restricts public benefits for aliens, based on the rationale that aliens should "not depend on public resources to meet their needs, but rather rely on their own capabilities and the resources of their families, their sponsors, and private organizations." 8 U.S.C. § 1601(2)(A). Congress declared the reforms to be "a compelling government interest" that is "in accordance with national immigration policy." *Id.* § 1601(5)–(6).

With regard to federal benefits,[2] Congress created two categories of aliens: "qualified aliens," who may be eligible for federal benefits, and all other aliens, who are ineligible for federal benefits. *Id.* §§ 1611–13, 1641. "Qualified aliens" are defined as legal permanent residents, asylees, refugees, certain parolees, and aliens who fall within other limited

---

[2] The Welfare Reform Act defines "[f]ederal public benefit" in relevant part as "any retirement, welfare, health, disability, public or assisted housing, postsecondary education, food assistance, unemployment benefit, or any other similar benefit for which payments or assistance are provided to an individual, household, or family eligibility unit by an agency of the United States or by appropriated funds of the United States." *Id.* § 1611(c)(1)(B).

categories specified in the statute.[3]  *Id.* § 1641(b)–(c).  The
Act renders aliens who are not qualified aliens ineligible for
all federal public benefits, with only limited exceptions, such
as the provision of emergency medical assistance.  *Id.*
§ 1611(b).

With regard to state benefits,[4] such as Basic Health
Hawai'i, Congress further subdivided aliens into three
categories: one category of aliens who are eligible for any
state public benefits (particular qualified aliens, such as
refugees, asylees, certain legal permanent residents, veterans
and members of the military on active duty), *id.* § 1622(b); a
second category to whom states may not give any benefits at
all (aliens who are not qualified aliens, nonimmigrants, or
parolees), *id.* § 1621(a); and a third category for whom
Congress authorizes states to make their own eligibility
determinations (qualified aliens, nonimmigrants, and aliens
paroled into the United States for less than a year), *id.*
§ 1622(a).  In articulating the immigration policy advanced
by the Welfare Reform Act, Congress emphasized that a state
that "follow[s] the Federal classification in determining the

---

[3] With some exceptions, the Act requires qualified aliens to have been
present in the United States for at least five years before they are eligible
for any federally funded benefit.  *Id.* § 1613(a)–(b).

[4] The Welfare Reform Act defines "[s]tate or local public benefit" in
relevant part as "(A) any grant, contract, loan, professional license, or
commercial license provided by an agency of a State or local government
or by appropriated funds of a State or local government; and (B) any
retirement, welfare, health, disability, public or assisted housing,
postsecondary education, food assistance, unemployment benefit, or any
other similar benefit for which payments or assistance are provided to an
individual, household, or family eligibility unit by an agency of a State or
local government or by appropriated funds of a State or local
government."  *Id.* § 1621(c)(1).

eligibility of . . . aliens for public assistance shall be considered to have chosen the least restrictive means available for achieving the compelling governmental interest of assuring that aliens be self-reliant in accordance with national immigration policy." *Id.* § 1601(7).

## II. MEDICAID AND COFA RESIDENTS

Medicaid is a cooperative state-federal program in which the federal government approves a state plan to fund medical services for low-income residents and then reimburses a significant portion of the state's expenses in financing that medical care. *See* Pub. L. No. 89-97, 79 Stat. 286, 343 (1965) (codified as amended at 42 U.S.C. § 1396 et seq.); *see also Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498, 502 (1990). Participation by states is voluntary, but in order to receive federal funds, participating states must comply both with the statutory requirements of the Medicaid Act and with regulations promulgated by the Secretary of Health and Human Services. *See Alaska Dep't of Health & Soc. Servs. v. Ctrs. for Medicare & Medicaid Servs.*, 424 F.3d 931, 935 (9th Cir. 2005). In 1993, Hawai'i obtained a waiver from compliance with some of the guidelines pursuant to § 1115 of the Social Security Act so that it could create a privatized managed care demonstration project that allows Hawai'i to contract with health-maintenance organizations ("HMOs") for the provision of state health insurance. *AlohaCare v. Hawai'i Dep't of Human Servs.*, 572 F.3d 740, 743 (9th Cir. 2009).

Before the Welfare Reform Act, COFA Residents were eligible for federal Medicaid subsidies and received medical services through Hawai'i's state-sponsored managed care plans. The Welfare Reform Act changed the landscape

dramatically by rendering nonimmigrants and others ineligible for federal public benefits. As nonimmigrants, COFA Residents are thus ineligible for Medicaid.[5] For purposes of state benefits, however, nonimmigrants fall within the category of aliens for whom states are authorized to set their own eligibility criteria.

After Congress made nonimmigrants ineligible for federal reimbursement through Medicaid, Hawai'i initially continued to provide the same medical benefits to COFA Residents as before, but funded the shortfall exclusively through state funds. The parties agree that COFA Residents received the same benefits as citizens and qualified aliens, but quibble over whether the benefits were technically provided under the same plan.

Citing budget concerns, Hawai'i in 2010 dropped COFA Residents and qualified aliens who had resided in the United States for less than five years from the existing managed care plans. The state enrolled them instead in more limited coverage provided by Basic Health Hawai'i, a new state plan created exclusively for these two groups. Haw. Code R.

---

[5] The Immigration and Nationality Act defines "nonimmigrant" as any alien who has been admitted pursuant to one of the various visas set out in 8 U.S.C. § 1101(a)(15). With some exceptions, these visas generally admit aliens only temporarily and for a specific purpose, such as tourist visas, student visas, transit visas, or specialized work visas. COFA Residents, however, are entitled to reside in the United States as nonimmigrants indefinitely. Although there is no provision in 8 U.S.C. § 1101(a)(15) for COFA Residents, the Compact expressly provides for their admission as "nonimmigrants," without regard to the provisions of the Immigration and Nationality Act relating to labor certification and nonimmigrant visas. Compact of Free Association Act of 1985, Pub. L. No. 99-239 § 141, 99 Stat. 1770, 1804.

§ 17-1722.3-1. Benefits under Basic Health Hawai'i are limited with respect to physician visits, hospital days and prescription drugs, and recipients do not qualify for the state's organ and tissue transplant program or its insurance plans covering long-term care services. *Id.* § 17-1722.3-18–19.

## III. PROCEEDINGS IN THE DISTRICT COURT

Korab, a dialysis patient who had been seeking a kidney transplant, sued to stop the diminution in benefits. He alleged that removing COFA Residents from the state's comprehensive insurance plans and enrolling them instead in Basic Health Hawai'i constituted discrimination based on alienage in violation of the Equal Protection Clause of the Constitution and in violation of the Americans with Disabilities Act ("ADA"). Korab sought a preliminary injunction based solely on the constitutional claim.

The district court reasoned that Congress's power to pass the alienage restrictions in the Welfare Reform Act flows from the powers enumerated in the Naturalization Clause of the Constitution, which authorizes Congress to "establish an uniform Rule of Naturalization." U.S. Const., art. I, § 8, cl. 4. The district court concluded that the Welfare Reform Act is not sufficiently uniform because it grants states some discretion with regard to the provision of state benefits to aliens. Accordingly, the district court found that strict scrutiny applied to Hawai'i's decision to treat COFA Residents differently from citizens and qualified aliens. Strict scrutiny requires the government to prove that any classifications based on protected characteristics "'are narrowly tailored measures that further compelling governmental interests.'" *Johnson v. California*, 543 U.S.

499, 505 (2005) (quoting *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 227 (1995)). Applying strict scrutiny, the district court concluded that Hawai'i had not identified any valid state interest advanced by the removal of COFA Residents from the existing state-funded benefit plan. The district court denied Hawai'i's motion to dismiss and granted a preliminary injunction blocking Hawai'i from reducing benefits for COFA Residents.

The preliminary injunction standard is well known: "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Although we review the district court's grant of preliminary injunctive relief for an abuse of discretion, *Harris v. Bd. of Supervisors*, 366 F.3d 754, 760 (9th Cir. 2004), a court would necessarily abuse that discretion if it "'based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence,'" *Roe v. Anderson*, 134 F.3d 1400, 1402 (9th Cir. 1998) (quoting *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405 (1990)). This is another way of saying that "interpretation of the underlying legal principles, however, is subject to de novo review." *Sw. Voter Registration Educ. Project v. Shelley*, 344 F.3d 914, 918 (9th Cir. 2003) (en banc) (per curiam).

## ANALYSIS

The Equal Protection Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. Accordingly, states

must generally treat lawfully present aliens the same as citizens, and state classifications based on alienage are subject to strict scrutiny review. *See In re Griffiths*, 413 U.S. 717, 719–22 (1973). In contrast, federal statutes regulating alien classifications are subject to the easier-to-satisfy rational-basis review. *See Hampton v. Mow Sun Wong*, 426 U.S. 88, 103 (1976). This case presents a conundrum that does not fit neatly within these broad rules. Although Basic Health Hawai'i is a state-funded program directed to a certain class of aliens, it is part of a larger, federal statutory scheme regulating benefits for aliens.

To understand the framework for resolving this case, it is helpful to start with the two key Supreme Court cases on benefits for aliens. In *Graham v. Richardson*, 403 U.S. 365, 367 (1971), the Supreme Court considered an equal protection challenge to two state statutes that denied welfare benefits to resident aliens. One statute imposed a residency requirement to become eligible for benefits, and the other statute excluded aliens from benefits altogether. *Id.* at 367–69. The Court emphasized that state classifications based on alienage are inherently suspect and subject to strict scrutiny, like classifications based on race or nationality. *Id.* at 372. "Aliens as a class," the Court determined, "are a prime example of a 'discrete and insular' minority for whom such heightened judicial solicitude is appropriate." *Id.* (quoting *United States v. Carolene Prods. Co.*, 304 U.S. 144, 153 n.4 (1938)). In the light of this searching judicial review, "a State's desire to preserve limited welfare benefits for its own citizens is inadequate to justify . . . making noncitizens ineligible." *Id.* at 374. The Court struck down both statutes as violations of the Equal Protection Clause. *Id.* at 376. Continuing to apply strict scrutiny to state laws discriminating on the basis of alienage, the Court has

repeatedly struck down an array of state statutes denying aliens equal access to licenses, employment, or state benefits. *See*, *e.g.*, *Bernal v. Fainter*, 467 U.S. 216, 217–18 (1984); *Nyquist v. Mauclet*, 432 U.S. 1, 12 (1977); *Examining Bd. of Eng'rs, Architects, & Surveyors v. Flores de Otero*, 426 U.S. 572, 601 (1976); *Sugarman v. Dougall*, 413 U.S. 634, 643 (1973).[6]

In the context of eligibility for the federal Medicare program, in *Mathews v. Diaz*, 426 U.S. 67, 82 (1976), the Court considered the constitutionality of congressional distinctions on the basis of alienage. Because "the responsibility for regulating the relationship between the United States and our alien visitors has been committed to the political branches of the Federal Government," the Court concluded that Congress may enact laws distinguishing between citizens and aliens so long as those laws are rationally related to a legitimate government interest. *Id.* at 81–82 (concluding that the Constitution "dictate[s] a narrow standard of review of decisions made by the Congress or the President in the area of immigration"); *see also Hampton*, 426 U.S. at 103 (holding that "[w]hen the Federal Government asserts an overriding national interest as justification for a discriminatory rule which would violate the Equal Protection Clause if adopted by a State, due process requires that there be a legitimate basis for presuming that the rule was actually intended to serve that interest").

---

[6] One limited exception to the application of strict scrutiny to state alienage classifications is the "political function" exception, which applies rational-basis review to citizenship requirements that states enact for elective and nonelective positions whose operations go to the heart of a representative government. *See Cabell v. Chavez-Salido*, 454 U.S. 432, 437–41 (1982).

Although aliens are protected by the Due Process and Equal Protection Clauses, this protection does not prevent Congress from creating legitimate distinctions either between citizens and aliens or among categories of aliens and allocating benefits on that basis. *Mathews*, 426 U.S. at 78 (explaining that "a legitimate distinction between citizens and aliens may justify attributes and benefits for one class not accorded to the other"). The difference between state and federal distinctions based on alienage is the difference between the limits that the Fourteenth Amendment places on discrimination by states and the power the Constitution grants to the federal government over immigration. *Id.* at 84–85; *see also Nyquist*, 432 U.S. at 7 n.8 ("Congress, as an aspect of its broad power over immigration and naturalization, enjoys rights to distinguish among aliens that are not shared by the States."). The Court in *Mathews* concluded that, given the federal government's extensive power over the terms of immigrants' residence, "it is unquestionably reasonable for Congress to make an alien's [benefit] eligibility depend on both the character and the duration of his residence." 426 U.S. at 82–83.

Recognizing that *Graham* and *Mathews* present pristine examples of the bookends on the power to impose alien classifications—a purely state law eligibility restriction in the case of *Graham* and a federal statute without state entanglements in the case of *Mathews*—it is fair to say that Basic Health Hawai'i presents a hybrid case, in which a state is following a federal direction. This variation was foreshadowed, however, by *Graham*. 403 U.S. at 381–82.

In its examination of Arizona's residency requirement for alien eligibility for welfare benefits, the Court in *Graham* considered whether a federal statute prohibiting state

requirements based on the length of citizenship, but not explicitly prohibiting requirements based on alienage, could be "read so as to authorize discriminatory treatment of aliens at the option of the States" and concluded that it did not. *Id.* at 382. The Court addressed the issue of states following congressional direction only elliptically, suggesting that a federal law granting wide discretion to the states "to adopt divergent laws on the subject of citizenship requirements . . . would appear to contravene [the] explicit constitutional requirement of uniformity" arising out of the Naturalization Clause. *Id*. Expanding on the reference to the uniformity requirement in *Plyler v. Doe*, 457 U.S. 202, 219 n.19 (1982), the Court explained: "if the Federal Government has by uniform rule prescribed what it believes to be appropriate standards for the treatment of an alien subclass, the States may, of course, follow the federal direction."

Korab does not challenge directly the validity of the federal classifications in the Welfare Reform Act. Nor does he dispute Hawaiʻi's selective classification within the "discretionary benefits" category of the Act—COFA Residents and qualified aliens present in the United States for fewer than five years are eligible for Basic Health Hawaiʻi; all other nonimmigrants and parolees are ineligible under Hawaiʻi's plan, even though they are included in the Act's "discretionary benefits" group. (This latter group is not part of this suit.) Instead, Korab challenges the lack of parity in benefits COFA Residents receive through Basic Health Hawaiʻi as compared to the benefits provided through Medicaid. As part of this argument, Korab essentially brings a backdoor challenge to the federal classifications, arguing that the state cannot provide differing levels of benefits through different programs because the uniformity requirement of the Naturalization Clause prohibits Congress

from granting states any discretion in the immigration or alienage contexts. We begin with the federal classifications established by the Welfare Reform Act and then address the appropriate level of constitutional scrutiny applicable to Hawai'i's decision to exercise the discretion afforded it by the Act.

## I. THE FEDERAL CLASSIFICATIONS: A UNIFORM NATIONAL POLICY

The Supreme Court has consistently held that the federal government possesses extensive powers to regulate immigration and the conditions under which aliens remain in the United States. *See Arizona v. United States*, 132 S. Ct. 2492, 2498 (2012) ("This authority [to regulate immigration and the status of aliens] rests, in part, on the National Government's constitutional power to 'establish an uniform Rule of Naturalization,' U.S. Const., Art. I, § 8, cl. 4, and its inherent power as sovereign to control and conduct relations with foreign nations. . . ." (citations omitted)). The reference to naturalization has been read broadly to mean federal control over the status of aliens, not just criteria for citizenship. *Id.* ("The Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens."); *see also Takahashi v. Fish & Game Comm'n*, 334 U.S. 410, 419 (1948) (noting congressional power under the Naturalization Clause to regulate the conduct of aliens).

In the Welfare Reform Act, Congress announced a "national policy with respect to welfare and immigration." 8 U.S.C. § 1601. Congress determined that immigrant self-sufficiency was an element of U.S. immigration policy and that there was a compelling national interest in assuring both

"that aliens be self-reliant" and that the availability of public benefits does not serve as an "incentive for illegal immigration." *Id.* § 1601(5)–(6). To accomplish these objectives, the statute sets out a comprehensive set of eligibility requirements governing aliens' access to both federal and state benefits. Federal benefits are, of course, strictly circumscribed by designated categories. Even for wholly state-funded benefits, the Act establishes three categories that states must follow: one category of aliens to whom states must provide all state benefits, a second category of aliens for whom states must not provide any state benefits, and a third category of aliens for whom Congress authorizes states to determine eligibility for state benefits. *Id.* §§ 1621–22. The limited discretion authorized for the third category, which includes COFA Residents, does not undermine the uniformity requirement of the Naturalization Clause.

On the federal level, only the Tenth Circuit has considered this issue. *Soskin v. Reinertson*, 353 F.3d 1242, 1256–57 (10th Cir. 2004). Like Hawai'i, Colorado initially chose to provide wholly state-funded health insurance coverage to all aliens in the third category. *Id.* at 1246. When Colorado did an about-face in 2003 and dropped this coverage, Soskin sued, arguing that letting states determine benefit eligibility was unconstitutional because it was not a sufficiently uniform federal rule. *Id.*

Looking to the origin of the Naturalization Clause, the Tenth Circuit concluded that "the uniformity requirement in the Naturalization Clause is not undermined by the [Welfare Reform Act's] grant of discretion to the states with respect to alien qualifications for Medicaid benefits." *Id.* at 1257. The uniformity requirement was a response to the tensions that

arose from the intersection of the Articles of Confederation's Comity Clause and the states' divergent naturalization laws, which allowed an alien ineligible for citizenship in one state to move to another state, obtain citizenship, and return to the original state as a citizen entitled to all of its privileges and immunities. *See Gibbons v. Ogden*, 22 U.S. 1, 36 (1824); The Federalist No. 42 (James Madison). The court in *Soskin* determined that because "the choice by one state to grant or deny . . . benefits to an alien does not require another state to follow suit," the purpose of the uniformity requirement is not undermined by states' discretion under the Welfare Reform Act. 353 F.3d at 1257.

We agree. Considering the Welfare Reform Act as a whole, it establishes a uniform federal structure for providing welfare benefits to distinct classes of aliens. The entire benefit scheme flows from these classifications, and a state's limited discretion to implement a plan for a specified category of aliens does not defeat or undermine uniformity. In arguing to the contrary, the dissent ignores that "a state's exercise of discretion can also effectuate national policy." *Id.* at 1255. As the Tenth Circuit explained in *Soskin*,

> When a state . . . decides against optional coverage [for certain noncitizens under the Welfare Reform Act], it is addressing the Congressional concern (not just a parochial state concern) that "individual aliens not burden the public benefits system." 8 U.S.C. § 1601(4). This may be bad policy, but it is Congressional policy; and we review it only to determine whether it is rational.

353 F.3d at 1255.  We are not in accord with the dissent's myopic view that the Welfare Reform Act establishes no federal direction and conclude that Hawai'i's discretionary decision to deny coverage to COFA Residents effectuates Congress's uniform national policy on the treatment of aliens in the welfare context.

This reading of the uniformity requirement finds an analog in the Supreme Court's interpretation of the Bankruptcy Clause, which similarly calls for uniformity.  *See* U.S. Const. art. I., § 8, cl. 4 (empowering Congress "[t]o establish an uniform Rule of Naturalization, and uniform Laws on the subject of Bankruptcies throughout the United States").  In *Hanover National Bank v. Moyses*, 186 U.S. 181 (1902), the Court considered a challenge to the 1898 Bankruptcy Act on the ground that its incorporation of divergent state laws failed to "establish uniform laws on the subject of bankruptcies" and unconstitutionally "delegate[d] certain legislative powers to the several states."  *Id.* at 183.  The Court held that the incorporation of state laws "is, in the constitutional sense, uniform throughout the United States" because the "general operation of the law is uniform although it may result in certain particulars differently in different states."  *Id.* at 190.

The principle that "uniformity does not require the elimination of any differences among the States" has equal traction here.  *Ry. Labor Execs.' Ass'n v. Gibbons*, 455 U.S. 457, 469 (1982).  As in the bankruptcy context, although the "particulars" are different in different states, the basic operation of the Welfare Reform Act is uniform throughout

the United States.[7] *Stellwagen v. Clum*, 245 U.S. 605, 613 (1918) (holding that bankruptcy law may be uniform and yet "may recognize the laws of the state in certain particulars, although such recognition may lead to different results in different states"). The overarching national policy and alienage classifications set out in the Welfare Reform Act have repeatedly been upheld by the federal courts on rational-basis review. *See, e.g.*, *Lewis v. Thompson*, 252 F.3d 567, 582–84 (2d Cir. 2001) (upholding the alienage classifications in the Welfare Reform Act); *City of Chicago v. Shalala*, 189 F.3d 598, 603–08 (7th Cir. 1999) (same); *see also Arizona*, 132 S. Ct. at 2499 ("Federal law also authorizes States to deny noncitizens a range of public benefits. . . .").

## II. THE STATE ACTION: HAWAI'I FOLLOWS THE FEDERAL POLICY AND DIRECTION

The logical corollary to the national policy that Congress set out in the Welfare Reform Act is that, where the federal program is constitutional, as it is here, states cannot be forced

---

[7] In an effort to distinguish the Bankruptcy Clause from the Naturalization Clause, the dissent argues that the Equal Protection Clause places constitutional constraints on states that are not present in the bankruptcy context. This argument misunderstands the analogy to the Bankruptcy Clause. We reference the Bankruptcy Clause only to show that uniformity is not undermined where states adopt different paths in effectuating a larger federal scheme or policy. That the Naturalization Clause is and has historically been subject to constitutional constraints not applicable to the Bankruptcy Clause says nothing about the more relevant question of whether uniformity is undermined by the existence of differences among the states. In the context of both clauses, the answer to that question is no, and the dissent offers no controlling authority to the contrary. Like the Tenth Circuit in *Soskin*, we conclude that the discretion afforded to states under the Welfare Reform Act does not undermine the uniformity established under that statute. *Soskin*, 353 F.3d at 1257.

to replace the federal funding Congress has removed. *See Pimentel v. Dreyfus*, 670 F.3d 1096, 1109 (9th Cir. 2012). We considered a similar situation in *Sudomir v. McMahon*, 767 F.2d 1456, 1457 (9th Cir. 1985), where plaintiffs brought an equal protection challenge to California's determination that a particular category of aliens was ineligible for benefits under the federal statute instructing states in the application of the cooperative federal-state Aid to Families with Dependent Children program. As we said in *Sudomir*, "[i]t would make no sense to say that Congress has plenary power in the area of immigration and naturalization and then hold that the Constitution impels the states to refrain from adhering to the federal guidelines." *Id.* at 1466.

Like the plaintiffs in *Sudomir*, Korab argues, and the dissent agrees, that the state has a constitutional obligation to make up for the federal benefits that Congress took away from him. Putting this argument in practical funding terms, states would be compelled to provide wholly state-funded benefits equal to Medicaid to all aliens in the discretionary third category, thus effectively rendering meaningless the discretion Congress gave to the states in 8 U.S.C. § 1622(a). *See Sudomir*, 767 F.2d at 1466 ("To so hold would amount to compelling the states to adopt each and every more generous classification which, on its face, is not irrational."). As the New York Court of Appeals put it in upholding a state program that provided partial benefits to aliens who were federally ineligible, the right to equal protection does not "require the State to remediate the effects of [the Welfare Reform Act]." *Khrapunskiy v. Doar*, 909 N.E.2d 70, 77 (N.Y. 2009); *see also Finch v. Commonwealth Health Ins. Connector Auth.*, 946 N.E.2d 1262, 1286 (Mass. 2011) (Gants, J. concurring in part and dissenting in part) ("It is inconsistent with *Mathews* to require the State to undo the

effect of Congress's decision and replace the funds that Congress, under its plenary power over aliens, determined it would not provide.").

Congress has drawn the relevant alienage classifications, and Hawai'i's only action here is its decision regarding the funding it will provide to aliens in the third, discretionary category created by Congress—an expenditure decision. Korab fails to offer any evidence that Hawai'i, in making that decision, has not closely "follow[ed] the federal direction" and adhered to the requirements prescribed by Congress in its provision of state benefits. *Plyler*, 457 U.S. at 219 n.19. Notably, Korab has not even alleged that the *state* expenditures for health insurance for aliens within the discretionary category created by Congress are less than the state expenditures for health insurance for others.[8] Even

---

[8] At this stage of the proceedings, we harbor serious doubts that Korab has carried his initial burden to establish a claim of disparity vis-a-vis the state's actions. Under Medicaid, citizens and eligible aliens are covered under a plan funded by both federal and state funds. By contrast, Basic Health Hawai'i is funded solely by the state. Here, however, Korab has not claimed that COFA Residents are receiving less per capita *state* funding than citizens or qualified aliens. *Finch*, 946 N.E.2d at 1288 (Gants, J., concurring in part and dissenting in part) ("[S]trict scrutiny is the appropriate standard of review to evaluate a State's alienage classification only where the State's per capita expenditures for the plaintiff aliens are substantially less than the per capita amount contributed by the *State* for similarly situated Commonwealth Care participants . . . ."). Nor has Korab offered any evidence that the state's average expenditures on behalf of COFA Residents in Basic Health Hawai'i are less than the amount the state contributes for citizens and qualified aliens eligible for Medicaid. On this record, Hawai'i "does nothing more than refuse to expend State monies to restore the Federal funds lost by Congress's constitutional exercise of its plenary power." *Id.*; *Hong Pham v. Starkowski*, 16 A.3d 635, 646 (Conn. 2011) (concluding that Connecticut's elimination of state-funded health insurance for aliens

assuming *arguendo* that Hawaiʻi's discretionary decision not to provide optional coverage for COFA Residents constitutes alienage-based discrimination, that decision, which is indisputably authorized by the Welfare Reform Act, is subject to rational-basis review. The posture of Korab's constitutional challenge—essentially a complaint about state spending—coupled with the legitimacy of the federal statutory framework, leads to this conclusion.

The dissent urges a contrary result, seizing upon the Supreme Court's statement in *Graham* that "Congress does not have the power to authorize the individual States to violate the Equal Protection Clause." 403 U.S. at 382. We acknowledge the rhetorical force of this proposition, but, like the Tenth Circuit, conclude that the "proposition is almost tautological." *Soskin*, 353 F.3d at 1254. The constitutional question before us is not whether Congress may authorize Hawaiʻi to violate the Equal Protection Clause but rather "what constitutes such a violation when Congress has (clearly) expressed its will regarding a matter relating to aliens,"[9] as Congress has done through the Welfare Reform

---

merely implemented the Act's restrictions and did not create any alienage-based classifications). Nevertheless, because we vacate the district court's grant of the preliminary injunction on the ground that rational basis, rather than strict scrutiny, is the appropriate standard of scrutiny, we need not resolve this evidentiary question at this stage.

[9] The dissent claims that our reference to Congress's clearly expressed will demonstrates our "confusion as to whether this an equal protection or a preemption case." Dissent at 67 n.7. We are not confused. To determine the applicable level of constitutional scrutiny in this equal protection case, we ask whether Hawaiʻi is following the federal direction, *see Plyer*, 457 U.S. at 219 n.19, which in turn, demands consideration of Congress's intent in establishing a uniform federal policy through the Welfare Reform Act, *Soskin*, 353 F.3d at 1254–56. That Congress's will

Act. *Id.* Our determination that rational-basis review applies to Hawai'i's conduct is consistent with *Graham* and the Supreme Court's equal protection cases because Hawai'i is merely following the federal direction set forth by Congress under the Welfare Reform Act. *See Plyer*, 457 U.S. at 219 n.19. At bottom, the dissent reaches the wrong conclusion because it asks the wrong question and invites a circuit split.[10] *Soskin*, 353 F.3d at 1254–56.

Accordingly, we vacate the preliminary injunction and remand to the district court for further proceedings consistent with this opinion.[11] *See Doe v. Reed*, 586 F.3d 671, 676 (9th

---

is also the touchstone of preemption analysis does not render it irrelevant to the determination of the scrutiny required for our equal protection inquiry. *See Plyer*, 457 U.S. at 219 n.19; *Sudomir*, 767 F.2d at 1466.

[10] Beyond asking the wrong question, the dissent muddies its own analysis by continually shifting the target of its constitutional inquiry. On one hand, the dissent argues that "the state of Hawai'i . . . is ultimately responsible" for the "denial of equal benefits to COFA Residents," Dissent at 58, and that we must subject "Hawai'i's actions" to strict scrutiny, Dissent at 59. On the other hand, the dissent acknowledges that Congress, through the Welfare Reform Act, "was giving states broad discretion to discriminate against aliens in the provision of welfare benefits" but concludes that Congress lacked the constitutional power to do so. Dissent at 68–69. So which is it? Does the dissent challenge the constitutionality of Hawai'i's actions, Congress's, or both? The dissent's own mixing and matching on this point underscores why Hawai'i's conduct should be viewed as part and parcel of the federal welfare scheme, a scheme that is not challenged by Korab and has been deemed constitutional. *See, e.g.*, *Lewis*, 252 F.3d at 582–84; *Shalala*, 189 F.3d at 603–08.

[11] Judge Bybee has written a thoughtful and compelling concurrence urging the adoption of a preemption-based approach to alienage classifications. However, as Judge Bybee acknowledges, this fresh approach veers away from the controlling authority set forth in *Graham* and *Mathews* and goes where no circuit has gone. Concurrence at 52–53.

Cir. 2009) (reversing preliminary injunction ruling where the district court applied the incorrect level of scrutiny).

**VACATED AND REMANDED.**

BYBEE, Circuit Judge, concurring and concurring in the judgment:

I concur in full in Judge McKeown's thoughtful opinion for the court. Her opinion captures the unsettled nature of the current state of the law and offers a way through the morass of conflicting approaches. I write separately to explain why the law of alienage remains so unclear and how we might better approach it.

The courts' reaction to state implementation of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 ("PRWORA") demonstrates the conundrum of our current Equal Protection doctrine as applied to aliens. *Compare Soskin v. Reinertson*, 353 F.3d 1242, 1254 (10th Cir. 2004) (applying rational basis scrutiny to Colorado's PRWORA-based alien eligibility restrictions); *Khrapunskiy v. Doar*, 909 N.E.2d 70, 76 (N.Y. 2009) (holding that the Equal Protection Clause does not apply to

It is therefore unsurprising that neither party has addressed preemption on appeal, and neither should we at this stage. Just as significantly, Judge Bybee's preemption analysis—that the Hawaiʻi welfare program is not expressly or impliedly preempted nor does it violate Congress's dormant immigration power—sidesteps the ultimate constitutional question raised by Korab and briefed by both parties: namely, whether Hawaiʻi's action violates the Equal Protection Clause.

New York's PRWORA-based alien eligibility restrictions); *Hong Pham v. Starkowski*, 16 A.3d 635, 661 (Conn. 2011) (applying rational basis scrutiny to Connecticut's PRWORA-based alien eligibility restrictions); *with Finch v. Commonwealth Health Ins. Connector Auth.*, 946 N.E.2d 1262, 1279–80 (Mass. 2011) (applying strict scrutiny to Massachusetts' PRWORA-based alien eligibility restrictions); *Ehrlich v. Perez*, 908 A.2d 1220, 1243–44 (Md. 2006) (applying strict scrutiny to Maryland's PRWORA-based alien eligibility restrictions); *Aliessa ex rel. Fayad v. Novello*, 754 N.E.2d 1085, 1098 (N.Y. 2001) (applying strict scrutiny to New York's PRWORA-based alien eligibility restrictions); *see also Basiente v. Glickman*, 242 F.3d 1137, 1143 (9th Cir. 2001) (applying rational basis scrutiny to PRWORA-based restriction on aliens eligible for federal benefits in the Commonwealth of the Northern Marianas).

It is not surprising that courts might divide over the application of equal protection rules to the PRWORA. Even where courts agree on the standard of review, judges may disagree over the application of the standard. *See*, *e.g.*, *Fisher v. Univ. of Tex. at Austin*, 133 S. Ct. 2411 (2013); *Gratz v. Bollinger*, 539 U.S. 244 (2003); *Grutter v. Bollinger*, 539 U.S. 306 (2003); *United States v. Virginia*, 518 U.S. 515 (1996). What is remarkable is that seventy-five years after *United States v. Carolene Products Co.* announced the need for "more exacting judicial scrutiny" for "discrete and insular minorities," 304 U.S. 144, 153 n.4 (1938), and more than forty years since *Graham v. Richardson* declared classification based on alienage subject to strict scrutiny, 403 U.S. 365, 375 (1971), we should be divided over the proper *standard of review* for classifications based on alienage.

As discussed below, the *Graham* doctrine—while ostensibly clear when issued—has been, in fact, riddled with exceptions and caveats that make consistent judicial review of alienage classifications difficult. In the years since *Graham* was decided, the Supreme Court has applied different levels of scrutiny depending on whether the state or the federal government established the challenged restriction, whether the restriction involved economic rights or the democratic process of self-government (often stretching that concept), whether the restriction involved undocumented aliens, and whether the discriminatory classification was created by Congress or an administrative agency. A review of the history of alienage jurisprudence, with a particular review of *Graham*—both what it said and how it has been applied (and not applied) in the past forty years—suggests that it is time to rethink the doctrine. As I explain below, I am persuaded that an alternative approach based on preemption analysis would bring welcome clarity to this area. Employing preemption analysis instead of equal protection analysis in alienage cases will not spare us hard cases, but it offers us a mode of analysis that is more consistent with the Constitution, our history, and the Court's cases since *Graham*.

I

For over a century, the Supreme Court has recognized that aliens are "persons" entitled to the protection of the Fifth and Fourteenth Amendments. *See Wong Wing v. United States*, 163 U.S. 228, 237 (1896); *Yick Wo v. Hopkins*, 118 U.S. 356, 369 (1886); *see also Graham*, 403 U.S. at 371 ("It has long been settled . . . that the term 'person' in this context encompasses lawfully admitted resident aliens . . . and entitles both citizens and aliens to the equal protection of the

laws . . . ."). For the first half of the twentieth century, the Court was generally deferential to state alienage restrictions, so long as they did not interfere with "[t]he authority to control immigration—to admit or exclude aliens—[which] is vested solely in the Federal Government." *Truax v. Raich*, 239 U.S. 33, 42 (1915) (declaring unconstitutional an Arizona law requiring that employers with more than five employees hire at least 80 percent native-born citizens since "deny[ing] to aliens the opportunity of earning a livelihood when lawfully admitted to the state would be tantamount to the assertion of the right to deny them entrance and abode . . .") But where a state's discriminatory classification related to a public interest without a clear nexus to a field of federal control, the Court often upheld the restriction. *See Clarke v. Deckebach*, 274 U.S. 392, 396 (1927) (holding an Ohio law banning alien ownership of pool halls constitutional as it did not amount to "plainly irrational discrimination"); *Crane v. New York*, 239 U.S. 195 (1915) (upholding statute criminalizing the employment of aliens on public works contracts); *Terrace v. Thompson*, 263 U.S. 197, 221 (1923) (holding a Washington law banning alien ownership of land constitutional because "[t]he quality and allegiance of those who own, occupy and use the farm lands within [a State's] borders are matters of highest importance . . ."); *Heim v. McCall*, 239 U.S. 175, 194 (1915) (upholding a prohibition of employment of aliens on public works contracts constructing New York City subway in light of "the special power of the state over the subject-matter [government employment]"); *Patsone v. Pennsylvania*, 232 U.S. 138 (1914) (holding constitutional a law excluding aliens from hunting wild game and noting that "a state may classify [aliens] with reference to the evil to be prevented . . . if the class discriminated against is or reasonably might be considered to define those from whom the evil mainly is to be feared . . .").

The Court's approach to alienage restrictions began to change after the Second World War, notably in *Takahashi v. Fish & Game Comm'n*, 334 U.S. 410 (1948). In *Takahashi*, a Japanese resident alien fisherman challenged a California law barring aliens from obtaining commercial fishing licenses. The Court struck down the law on preemption grounds, but in the course of its discussion, it referred to the civil rights law enforcing the Fourteenth Amendment:

> The Federal Government has broad constitutional powers in determining what aliens shall be admitted to the United States, the period they may remain, regulation of their conduct before naturalization, and the terms and conditions of their naturalization. . . . State laws which impose discriminatory burdens upon the entrance or residence of aliens lawfully within the United States conflict with this constitutionally derived federal power to regulate immigration . . .

*Id.* at 419 (internal citation omitted). The Court then quoted the Civil Rights Act of 1866, now codified at 42 U.S.C. § 1981:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefits of all laws a proceedings for the security of persons and property as is enjoyed by white citizens . . .

*Id.* Finding that this section "extend[s] to aliens as well as to citizens," *id.* (footnote omitted), the Court declared that Congress had adopted the Civil Rights Act "*in the enactment of a comprehensive legislative plan for the nation-wide control and regulation of immigration and naturalization . . .*" *Id.* (emphasis added. Accordingly, California's provision conflicted with "a general policy" found in "[t]he Fourteenth Amendment and the laws adopted under its authority" that "all persons lawfully in this country shall abide 'in any state' on an equality of legal privileges with all citizens under non-discriminatory laws." *Id.* at 420. Without a "special public interest," California's law had to yield to federal law. *Id.*

It was in light of this fluctuating doctrine that the Court decided *Graham* in 1971.

## II

The root of much of the current confusion over the courts' treatment of alienage lies in *Graham* itself. *Graham* dealt with restrictions on public benefits imposed by Arizona and Pennsylvania. In Arizona, persons permanently and totally disabled were not eligible for assistance under a federal program in which Arizona participated if they were not citizens of the United States or had resided in the U.S. for fewer than fifteen years. 403 U.S. at 366–67. Pennsylvania had a general assistance program, one not funded in any part by the federal government, that limited participation to U.S. citizens. *Id.* at 368. The Court proceeded on two distinct analytic fronts: the Equal Protection Clause and federal preemption based on the Supremacy Clause. First, it addressed the state classifications under the Equal Protection Clause of the Fourteenth Amendment. U.S. Const. amend. XIV, § 1 ("No State shall . . . deny to any person within its

jurisdiction the equal protection of the laws."). Although the Court had mentioned the Fourteenth Amendment in connection with state restrictions on aliens in previous cases, the Court had never rested its judgment solely on the Equal Protection Clause.[1] In *Graham*, for the first time, the Court established a level of scrutiny, holding that "classifications based on alienage, like those based on nationality or race, are inherently suspect and subject to close judicial scrutiny." 403 U.S. at 372 (footnotes omitted). This meant that state classifications based on alienage must fall unless the state can show "a compelling state interest by the least restrictive means available." *Bernal v. Fainter*, 467 U.S. 216, 219 (1984). In *Graham*, Arizona's and Pennsylvania's "desire to preserve limited welfare benefits for its own citizens [was] inadequate to justify" the restrictions, 403 U.S. at 374, and "a concern for fiscal integrity" was not compelling. *Id.* at 375. With respect to Arizona, whose state plan—including its alienage restriction—was previously approved by the Secretary of Health, Education & Welfare, the Court construed federal law not to authorize the restrictions because "Congress does not have the power to authorize the individual States to violate the Equal Protection Clause." *Id.* at 382.

Second, and alternatively, the Court in *Graham* found the state laws preempted by federal law, thereby violating the Supremacy Clause. U.S. Const. art.VI, § 2 ("This Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law

---

[1] Even in *Yick Wo*, where the Court first declared aliens to be "persons" within the scope of the Fourteenth Amendment, the Court cited several sources of authority, including the U.S. treaty with China, the Fourteenth Amendment, and the Civil Rights Act of 1866. 118 U.S. at 368–69.

of the Land"). The Court found that the state restrictions on alienage could not "withstand constitutional scrutiny" because of "[t]he National Government['s] . . . 'broad constitutional powers in determining what aliens shall be admitted to the United States, the period they may remain, regulation of their conduct before naturalization, and the terms and conditions of their naturalization.'" *Graham*, 403 U.S. at 376–77 (quoting *Takahashi*, 334 U.S. at 419). Describing Congress's "comprehensive plan for the regulation of immigration and naturalization," including aliens who become "public charges," the Court found that "Congress has not seen fit to impose any burden or restriction on aliens who become indigent after their entry into the United States." *Id.* at 377. Accordingly, "State laws that restrict the eligibility of aliens for welfare benefits merely because of their alienage conflict with these overriding national policies in an area constitutionally entrusted to the Federal Government." *Id.* at 378. As "the States 'can neither add to nor take from the conditions lawfully imposed by Congress upon admission, naturalization and residence of aliens in the United States or the several states,'" Arizona's and Pennsylvania's "laws encroach[ing] upon exclusive federal power . . . [were] constitutionally impermissible." *Id.* at 378 (quoting *Takahashi*, 334 U.S. at 419), 380.

*Graham* was a watershed case in equal protection analysis because it placed classifications based on alienage in the same category as classifications based on race, *see Korematsu v. United States*, 323 U.S. 214, 216 (1944), and in a more protected class than classifications based on gender or illegitimacy, *see Craig v. Boren*, 429 U.S. 190, 197 (1976) (gender); *Clark v. Jeter*, 486 U.S. 456, 461 (1988) (illegitimacy). The implications of *Graham* were significant. Under an important line of cases, the *Graham* rule would

have bound the federal government to the same degree as the states. In *Bolling v. Sharpe*, 347 U.S. 497 (1954), decided the same day as *Brown v. Board of Education*, 347 U.S. 483 (1954), the Court held that the same equal protection principles applied to the federal government as applied to the states. That proposition was not obvious, because the Equal Protection Clause is found in the Fourteenth Amendment, which by its terms applies to the states and grants Congress the power to enforce it. U.S. Const. amend. XIV, §§ 1, 5. In *Bolling*, however, the Court declared it "unthinkable that the same Constitution would impose a lesser duty on the Federal Government." 347 U.S. at 500. Although the Court in *Brown* held that state discrimination on the basis of race violated the Equal Protection Clause of the Fourteenth Amendment, the Court in *Bolling* held that federal discrimination on the basis of race violated the equal protection component of the Due Process Clause of the Fifth Amendment. *Id.* at 499; *see also Brown*, 347 U.S. at 495 & n.12. Since *Bolling*, it has been well established that the "Court's approach to Fifth Amendment equal protection claims has always been precisely the same as to the equal protection claims under the Fourteenth Amendment." *Weinberger v. Wiesenfeld*, 420 U.S. 636, 638 n.2 (1975). *See United States v. Windsor*, 133 S. Ct. 2375, 2695 (2013) ("The liberty protected by the Fifth Amendment's Due Process Clause contains within it the prohibition against denying to any person the equal protection of the laws."); *United States v. Paradise*, 480 U.S. 149, 166 n.16 (1987) (plurality opinion of Brennan, J.) ("[T]he reach of the equal protection guarantee of the Fifth Amendment is coextensive with that of the Fourteenth . . ."); *Buckley v. Valeo*, 424 U.S. 1, 93 (1976) ("Equal protection analysis in the Fifth Amendment area is the same as that under the Fourteenth Amendment."). *But see Hampton v. Mow Sun Wong*, 426 U.S. 88, 100 (1976) ("Although both [the Fifth

and Fourteenth] Amendments require the same type of [equal protection] analysis, . . . the two protections are not always coextensive.").

In the Court's most extensive discussion to date of the *Bolling* principle, the Court recounted that in *Bolling* "the Court for the first time explicitly questioned the existence of any difference between the obligations of the Federal Government and the States to avoid racial classifications." *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 215 (1995). While "*Bolling*'s facts concerned school desegregation, . . . its reasoning was not so limited." *Id.* The Court repeated "'that the Constitution of the United States, in its present form, forbids, so far as the civil and political rights are concerned, discrimination *by the General Government, or by the States*, against any citizen because of his race.'" *Id.* at 216 (emphasis in original) (quoting *Bolling*, 347 U.S. at 499) (other citation and quotation marks omitted). The Court also underscored that the equal protection component of the Fifth Amendment is "an obligation equivalent to that of the States." *Id.*; *see id.* at 217 ("the equal protection obligations imposed by the Fifth and the Fourteenth Amendments [are] indistinguishable"). The only exception might be "a few contrary suggestions appearing in cases in which we found special deference to the political branch of the Federal Government to be appropriate to detract from this general rule." *Id.* at 217–18 (citing *Hampton*, 426 U.S. at 88).

This last caveat was huge. It turns out that, in the area of immigration and naturalization, the "unthinkable," *Bolling*, 347 U.S. at 500, was exactly what the Court had been thinking for more than one-hundred years. The obligations of the federal government and the states with respect to aliens

were indeed "[]distinguishable," *Adarand*, 515 U.S. at 217.
In a venerable line of cases, the Court had approved the
political branches' control over the privileges that aliens
enjoy in the United States. *See*, *e.g.*, *Fiallo v. Bell*, 430 U.S.
787, 792–96 (1977); *Hines v. Davidowitz*, 312 U.S. 52, 62–68
(1941); *Fong Yue Ting v. United States*, 149 U.S. 698,
711–14 (1893); *Henderson v. Mayor of New York*, 92 U.S.
259, 273–74 (1876); *Chy Lung v. Freeman*, 92 U.S. 275, 280
(1876). At the same time, the Court had established that the
states had some, but not unlimited, control over aliens'
privileges within the state. *See Part I, supra*.

From the outset, the *Graham* rule, *simpliciter*, was
unsupportable. *See Adarand*, 515 U.S. at 217–18
(acknowledging that the equal protection component of the
Fifth Amendment is coextensive with that of the Fourteenth
Amendment except with respect to some of the alien cases);
*United States v. Verdugo-Urquidez*, 494 U.S. 259, 273 (1990)
("[Our decisions] expressly accord[] differing protection to
aliens than to citizens, based on our conclusion that the
particular provision in question were not intended to extend
to aliens in the same degree as to citizens."); David P. Currie,
*The Constitution in the Supreme Court: The Second Century,
1888–1986*, at 500 (1990) (*Graham* "carried this line of
authority to the extreme of declaring alienage as suspect a
classification as race—a characterization so implausible that
it would soon have to be revised.") (footnote omitted).

At the first opportunity, the Court declined to impose the
equal protection component of the Fifth Amendment on the
federal government. Indeed, the *Graham* rule, as a mode of
equal protection analysis, has never been fully applied to the
federal government since *Graham.* Just five years after
*Graham*, in *Mathews v. Diaz*, the Court phrased the issue as

"whether Congress may condition an alien's eligibility for participation in a federal medical insurance program on continuous residence in the United States for a five-year period and admission for permanent residence." 426 U.S. 67, 69 (1976). The Court did not begin with *Graham* and equal protection analysis. Rather, it divided the alienage question into two parts: May Congress discriminate between citizens and aliens? And may Congress discriminate between different groups of aliens? As to the first question, the Court had little difficulty finding that "[i]n the exercise of its broad power over naturalization and immigration, Congress regularly makes rules that would be unacceptable if applied to citizens. . . . The fact that an Act of Congress treats aliens differently from citizens does not in itself imply that such disparate treatment is 'invidious.'" *Id.* at 79–80. The Court made no acknowledgment of *Graham* or *Bolling*. With respect to the second question, and again without even mentioning *Graham* or *Bolling*, the Court reasoned that since it was

> obvious that Congress has no constitutional duty to provide *all aliens* with the welfare benefits provided to citizens, the party challenging the constitutionality of the particular line Congress has drawn has the burden of advancing principled reasoning that will at once invalidate that line and yet tolerate a different line separating some aliens from others.

*Id.* at 82 (emphasis added). In the end, the Court declined to "substitute [its] judgment for that of Congress in deciding which aliens shall be eligible to participate in the supplementary insurance program on the same conditions as

citizens." *Id.* at 84. Only then did the Court consider *Graham*, which it had no difficulty distinguishing "because it concerns the relationship between aliens and the States rather than between aliens and the Federal Government. . . . Classification [of aliens] by the Federal Government is a routine and normally legitimate part of its business." *Id.* at 84–85.

The same day, the Court decided *Hampton v. Mow Sun Wong*, 426 U.S. at 88. In *Hampton*, lawful permanent residents were denied federal employment by the Civil Service Commission because they were not U.S. citizens. This time, however, the Court began with an equal protection analysis consistent with *Graham*. Citing *Sugarman v. Dougall*, 413 U.S. 634 (1973), and *In re Griffiths*, 413 U.S. 717 (1973), two cases in which the Court had applied *Graham*'s equal protection analysis to strike down state restrictions on alien employment, the Court similarly struck the federal restrictions on the employment of non-citizens. The Court linked *Graham* and *Bolling*, but to distinguish them: "Although both [the Fifth and Fourteenth] Amendments require the same type of analysis . . . the two protections are not always coextensive." *Hampton*, 426 U.S. at 100.[2] The Court observed that *Sugarman* dictated that the

_____

[2] The only other reference I can locate in which the Court refers to both *Bolling* and *Graham* was later in the same Term in *Examining Board of Engineers, Architects, and Surveyors v. Flores de Otero*, where the Court struck down a Puerto Rico law restricting civil engineers to U.S. citizens. 426 U.S. 572 (1976). One of the questions was the constitutional status of Puerto Rico. For the Court's purposes, Puerto Rico's status did not matter: "If the Fourteenth Amendment is applicable, the Equal Protection Clause nullifies the statutory exclusion. If, on the other hand, it is the Fifth Amendment and its Due Process Clause that apply, the statute's

Court strike the restriction on federal employment of aliens unless there was an "overriding national interest[]," *id.* at 101, proof of which would have to come from Congress or the President, and not just from the Civil Service Commission, *id.* 103, 105, 116.

What is odd about the juxtaposition of these two cases is the way in which the Court followed on the one hand, and virtually ignored on the other, the equal protection principles it had previously announced. In *Hampton*, the Court followed equal protection principles, finding that the federal employment restrictions were presumptively invalid under *Sugarman* unless there was a compelling governmental interest and the rules "were expressly mandated by the Congress or the President . . . ." *Id*. at 103. When the Court couldn't find such an interest mandated by the elected branches, the law fell. It would have been easy enough in *Mathews* for the Court to have analyzed the restrictions on federal benefits under equal protection, but the Court made *Graham* an afterthought. Had it started with *Graham*, the Court would have considered the statutory restrictions on aliens receiving federal benefits presumptively invalid and then asked whether there was a compelling governmental interest. *See* Gerald M. Rosberg, *The Protection of Aliens from Discriminatory Treatment by the National Government*, 1977 Sup. Ct. Rev. 275, 294 ("The existence of these special federal interests may explain why the federal government can demonstrate a compelling need for a particular classification even though a state could not. But it does not in an obvious way explain why the burden of justification on the federal government should be different from the burden on a state.").

---

discrimination is so egregious that it falls with the rule of [*Bolling v. Sharpe*]." *Id.* at 601.

Given the Court's statements in *Hampton*, and given its analysis of the national interest in naturalization and immigration, the Court might well have honored Congress's preferences, even under strict scrutiny. *But see Hampton*, 426 U.S. at 117 (Brennan, J., concurring) (joining the majority opinion "with the understanding that there are reserved the equal protection questions that would be raised by congressional or Presidential enactment of a bar on employment of aliens by the Federal Government"). Instead, the Court largely ignored the equal protection component of the Fifth Amendment and left us scratching our heads over two entirely separate modes of analysis of challenges to federal restrictions on alienage.[3]

The *Bolling* equivalence principle aside, the Court has also qualified *Graham* as applied to the states. The Court has tended to affirm state classifications regarding political or democratic rights afforded to aliens and has tended to invalidate those classifications that limited the distribution of economic benefits or regulated commercial opportunities, altering the level of scrutiny on an almost case-by-case basis. Following *Graham*, the Court has applied strict scrutiny to some state restrictions on *aliens—see, e.g.*, *Bernal*, 467 U.S. at 216 (holding unconstitutional a Texas law prohibiting

---

[3] *Compare* Erwin Chemerinsky, *Constitutional Law: Principles and Policies* § 9.5.3 at 744 (3d ed. 2002) ("the Court's decisions can be criticized for so openly manipulating the level of scrutiny. The Court could have used strict scrutiny . . . .") *with* David F. Levi, Note, *The Equal Treatment of Aliens: Preemption or Equal Protection?*, 31 Stan. L. Rev. 1069, 1091 (1979) ("The Supreme Court's creation in *Graham v. Richardson* of a suspect classification of alienage has not been a successful experiment. . . . [T]he equal treatment of resident aliens by the states is required by preemption rather than by the equal protection clause.").

aliens from becoming notaries); *Nyquist v. Mauclet*, 432 U.S. 1 (1977) (holding unconstitutional a New York law barring resident aliens from state assistance for higher education); *In re Griffiths*, 413 U.S. at 717 (holding unconstitutional a Connecticut law barring aliens from becoming lawyers); *Sugarman*, 413 U.S. at 634 (holding unconstitutional a New York City law making aliens ineligible for city employment)—but not to others. In one case it applied a form of intermediate scrutiny. *See Plyler v. Doe*, 457 U.S. 202 (1982) (holding unconstitutional a law requiring alien schoolchildren to pay for education that was free to citizens). In still other cases, the Court has applied rational basis scrutiny instead. *See, e.g.*, *Cabell* v. *Chavez-Salido*, 454 U.S. 432 (1982) (holding constitutional a California law requiring probation officers to be citizens); *Ambach v. Norwick*, 441 U.S. 68 (1979) (holding constitutional a New York law requiring public schoolteachers to be citizens); *Foley v. Connelie*, 435 U.S. 291 (1978) (holding constitutional a New York law limiting appointment to state police force to citizens). And in still other cases, the Court has largely ignored the Equal Protection Clause altogether. *See Toll v. Moreno*, 458 U.S. 1 (1982) (holding that the University of Maryland's policy barring domiciled aliens and their dependents from acquiring in-state tuition violated the supremacy clause); *Elkins v. Moreno*, 435 U.S. 647 (1978) (holding that whether resident aliens can become domiciliaries of Maryland is a matter of state law the federal courts should leave to state courts as a matter of comity); *DeCanas v. Bica*, 424 U.S. 351 (1976) (holding that a California law prohibiting an employer from knowingly employing an illegal alien was not unconstitutional as a regulation of immigration or as being preempted under the Supremacy Clause).

The curious point for my purposes is not so much whether the Court upheld or struck down the state restrictions in the face of an equal protection challenge, but that the Court did not apply a consistent standard of review.[4] It would be one thing if the Court, consistently applying strict scrutiny, upheld some state restrictions while striking others. It is an entirely different matter when the Court doesn't apply consistently its standard of review. With all due respect for the difficulty of these questions, the Court's indecision over the equal protection standard of review gives these cases the appearance that the standard has been manipulated to accommodate the Court's intuition over the result in the particular case. And its case law makes lower court review of alienage restrictions all the more difficult.

### III

This brief history should make us rethink whether *Graham*'s equal protection analysis alone can explain the Court's cases. Obviously, I believe that it cannot. But I do believe that *Graham*'s preemption analysis, not its equal protection analysis, has significant explanatory power here.

A preemption analysis is more securely anchored in the Constitution itself. There can be little question that "[t]he

---

[4] As the Majority notes, Maj. Op. 25 n.10, the Dissent suggests both that Hawai'i's denial of equal benefits to COFA residents is subject to strict scrutiny, Dissent at 59, and that Congress has given the states "broad discretion to discriminate against aliens in the provision of welfare benefits," Dissent at 68–69, all of which underscores the difficulty of applying a uniform standard of review in cases involving alienage, especially when they involve the intersection of federal schemes and state schemes that have—at least in the abstract—been afforded differing levels of scrutiny.

Government of the United States has broad . . . power over the subject of immigration and the status of aliens." *Arizona v. United States*, 132 S. Ct. 2492, 2498 (2012). The constitutional sources for that power are both textual and structural. Most obviously, Article I grants Congress express authority to "establish an uniform Rule of Naturalization." U.S. Const. art. I, § 8, cl. 4. In addition, the authority of the political branches to determine the terms on which aliens may immigrate to the United States, whether to visit, study, work, marry, or remain, rests on an undefined amalgamation of powers vested in Congress and the President. Those powers include the Foreign Commerce Clause, *id.* art. I, § 8, cl. 3 ("Congress shall have Power . . . to regulate Commerce with foreign Nations"), and the foreign affairs powers derived from the President's authority "to make Treaties" and "appoint Ambassadors, other public Ministers and Consuls," *id.* art. II, § 2, cl. 2, and to "receive Ambassadors and other public Ministers," *id.* art. II, § 3. *See Toll*, 458 U.S. at 10. The Court has also relied on the "inherent power [of the United States] as sovereign to control and conduct relations with foreign nations," *Arizona*, 132 S. Ct. at 2498, including concepts core to "the conduct of foreign relations, the war power, and the maintenance of republican form of government," *Harisiades v. Shaughnessy*, 342 U.S. 580, 588–89 (1952). *See also United States v. Valenzuela-Bernal*, 458 U.S. 858, 864 (1982) ("The power to regulate immigration—an attribute of sovereignty essential to the preservation of any nation—has been entrusted by the Constitution to the political branches of the Federal Government."); *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 210 (1953) ("[T]he power to expel or exclude aliens [is] a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control"). In sum, the Court has said, "'over no

conceivable subject is the legislative power of Congress more complete than it is over' the admission of aliens." *Fiallo*, 430 U.S. at 792 (quoting *Oceanic Navigation Co. v. Stranahan*, 214 U.S. 320, 339 (1909)).

The Court has frequently employed preemption as its mode of analyzing state restrictions based on alienage. In general, there are three ways Congress may preempt a law through legislation. *See Arizona*, 132 S. Ct. at 2500–01. First, because Congress possesses plenary authority over immigration and naturalization, Congress may expressly preempt certain laws. *See*, *e.g.*, *Chamber of Commerce v. Whiting*, 131 S. Ct. 1968 (2011) (discussing 8 U.S.C. § 1324a(h)(2), which forbids "any State or local law imposing civil or criminal sanctions . . . upon those who employ . . . unauthorized aliens"). Second, where state laws actually conflict with federal laws, the state laws must yield. *Arizona*, 132 S. Ct. at 2502 (holding that a law making failure to comply with federal alien-registration requirements a state misdemeanor was preempted). Third, even where Congress has not expressly preempted state laws, but "has enacted a complete scheme of regulation . . . , states cannot, inconsistently with the purpose of Congress, conflict or interfere with, curtail or complement, the federal law, or enforce additional or auxiliary regulations." *Hines*, 312 U.S. at 66. This is so-called field preemption.[5] *See*, *e.g.*, *Toll*,

---

[5] The distinction between actual conflict preemption and field preemption is not always clear. *See*, *e.g.*, *Arizona*, 132 S. Ct. at 2502 (finding that "the Federal Government has occupied the field of alien registration" but then concluding that "[p]ermitting [Arizona] to impose its own penalties for the federal offense here would conflict with the careful framework Congress adopted"). *See also Hines*, 312 U.S. at 67 (noting that expressions such as "conflicting" or "occupying the field" do

458 U.S. at 17 (holding that the Immigration and Nationality Act was a comprehensive regulation of domiciled, non-immigrant G-4 visa holders and that it preempted Maryland's refusal to grant such persons in-state tuition); *Hine*s, 312 U.S. at 74 (holding that the Alien Registration Act of 1940 preempted Pennsylvania's alien registration requirements).

Even where Congress has not legislated specifically, the Court has enforced a kind of "dormant immigration"[6] analysis. The principle of "dormant" legislative authority was first recognized in a commerce case, *Cooley v. Bd. of Wardens*: "Whatever subjects of this power are in their nature national, or admit only of one uniform system, or plan of regulation, may justly be said to be of such a nature as to require exclusive legislation by Congress." 53 U.S. (12 How.) 299, 319 (1852). Since that time, the Court has defended Congress's power to legislate exclusively on matters requiring a national or uniform rule, irrespective of whether Congress has in fact adopted such a rule. The Court has invoked the same principle in the context of immigration. In *Henderson v. Mayor of the City of New York*, it struck New York and Louisiana provisions that taxed passengers arriving from overseas. 92 U.S. at 259. Citing *Cooley*, the Court wrote that taxing arriving aliens imposed a burden on Congress's powers under the Foreign Commerce Clause and on our "international relations":

---

not provide "an infallible constitutional test or an exclusive constitutional yardstick").

[6] *See* Erin F. Delaney, Note, *In the Shadow of Article I: Applying a Dormant Commerce Clause Analysis to State Laws Regulating Aliens*, 82 N.Y.U. L. Rev. 1821 (2007); Karl Manheim, *State Immigration Laws and Federal Supremacy*, 22 Hastings Const. L.Q. 939, 958 (1995) (referring to the "Dormant Immigration Clause").

> A regulation which imposes onerous, perhaps impossible, conditions on those engaged in active commerce with foreign nations, must of necessity be national in its character. It is more than this; for it may properly be called *international*. It belongs to that class of laws which concern the exterior relation of this whole nation with other nations and governments.

*Id.* at 273. Accordingly, "[t]he laws which govern the right to land passengers in the United States from other countries" "may be and ought to be, the subject of uniform system or plan." *Id. See Hines*, 312 U.S. at 66–67; *Chy Lung*, 92 U.S. at 280 ("The passage of laws which concern the admission of citizens and subjects of foreign nations to our shores belongs to Congress, and not to the States. . . . If it be otherwise, a single State can, at her pleasure, embroil us in disastrous quarrels with other nations."). *But see DeCanas*, 424 U.S. at 354–55 ("[T]he Court has never held that every state enactment which in any way deals with aliens is a regulation of immigration and thus per se pre-empted by this constitutional power, whether latent or exercised. . . . [T]he fact that aliens are the subject of a state statute does not render it a regulation of immigration . . .").

The Court has recently enforced Congress's dormant powers where, even though state law does not actually conflict with federal law, it is inconsistent with a national rule or scheme. *See Arizona*, 132 S. Ct. at 2504–05 (observing that Congress's "comprehensive framework does not impose federal criminal sanctions on [aliens who seek or engage in unauthorized work]" and that Arizona's law imposing criminal penalties on unauthorized alien employees

"conflict[s with] the method of enforcement" because "Congress [must have] decided it would be inappropriate to impose criminal penalties on aliens who seek or engage in unauthorized employment").

In some, even comprehensive, legislative schemes, Congress has expressly authorized states to regulate certain aspects of an alien's privileges within the state. The Court recently approved state laws that relied on such authorization. In *Chamber of Commerce v. Whiting*, Congress expressly preempted "'any State or local law imposing civil or criminal sanctions (*other than through licensing and similar laws*) upon those who employ . . . unauthorized aliens.'" 131 S. Ct. at 1968 (quoting 8 U.S.C. § 1324(h)(2) (emphasis added)). In effect, the parenthetical was express congressional non-preemption. In response, Arizona adopted the Legal Arizona Workers Act in which it provided that employers who knowingly or intentionally employed unauthorized aliens could have their business licenses suspended or revoked. The Court rejected a claim that Arizona's law was either expressly or impliedly preempted by federal law. With respect to express preemption, the Court held that federal law "expressly preempts some state powers dealing with the employment of unauthorized aliens and it expressly preserves others. We hold that Arizona's licensing law falls well within the confines of the authority Congress chose to leave to the States." *Id.* at 1981. With respect to the claim of implied preemption, the Court observed that "[g]iven that Congress specifically preserved such authority for the States, it stands to reason that Congress did not intend to prevent the States from using appropriate tools to exercise that authority." *Id.* (plurality opinion). The Court noted that Arizona's "tools" mirrored the federal provisions, including "us[ing] the Federal Government's own definition of 'unauthorized alien,'

. . . rel[ying] solely on the Federal Government's own determination of who is an unauthorized alien, and requir[ing] Arizona employers to use the Federal Government's own system for checking employee status." *Id.* at 1987.

All of which is to suggest that preemption analysis, not equal protection, is the better approach, for preemption analysis can be applied more consistently to alienage cases, with more predictable outcomes for parties and courts.

IV

The choice between a pure preemption analysis and a pure equal protection analysis yields very different results in this case.

A

In my view, and consistent with the majority opinion, Hawai'i's health insurance program at issue in this case is not expressly preempted by any federal law. Neither does it actually conflict with any federal law, nor does it obstruct in any way the congressional scheme. Hawai'i's law most resembles the law at issue in *Chamber of Commerce*: Hawai'i has responded to a congressional authorization, and it has mirrored federal law to make its law consistent with the federal scheme.

As the majority opinion explains, Congress has established three categories of aliens for purposes of federal and state benefits. Maj. Op. at 7–9; *see Pimentel v. Dreyfus*, 670 F.3d 1096, 1100–01 (9th Cir. 2012). One group of aliens—including permanent resident aliens, refugees and

asylees, and aliens who are serving or have served in the Armed Forces of the United States—"shall be eligible for any State public benefits." 8 U.S.C. § 1622(b). A second group of aliens—including those aliens here without authorization—are "not eligible for any State or local public benefit," unless the state adopted a law "after August 22, 1996, . . . affirmatively provid[ing] for such eligibility." *Id.* § 1621(a), (d). Finally, the third group includes all other aliens. For this group, "a State is authorized to determine the eligibility for any State public benefits." *Id.* § 1622(a). The plaintiffs in this case, who are nonimmigrant aliens admitted under the Compact of Free Association with the United States,[7] fall into this third category.

Section 1622(a), as plainly as words can express it, authorizes states to decide whether to make that class of aliens eligible for state benefits. It is, as in *Chamber of*

---

[7] *See* Compact of Free Association, *reprinted at* 48 U.S.C. § 1901 note. A citizen of the Marshall Islands or the Federated States of Micronesia may "establish residence as a nonimmigrant in the United States and its territories and possessions." Compact § 141(a). The Compact further specifies:

> The right of such persons to establish habitual residence in a territory or possession of the United States may, however, be subjected to nondiscriminatory limitations provided for:
>
> (1) in statutes or regulations of the Unities States; or
>
> (2) in those statutes or regulations of the territory or possession concerned which are authorized by the laws of the United States.

Compact § 141(b).

*Commerce*, express non-preemption.   *See Chamber of Commerce*, 131 S. Ct. at 1981.  As in *Chamber of Commerce,* Hawai'i "uses the Federal Government's own definition of ['qualified alien'], [and] relies solely on the Federal Government's own determination of who is a[] '[qualified alien']."   *Id.* at 1987.   By definition, Hawai'i's act is authorized by Congress and, accordingly, is not preempted. *Id*. (plurality opinion).  Hawai'i has "'neither added[ed] to nor take[n] from the conditions lawfully imposed by Congress.'" *Graham*, 403 U.S. at 378 (quoting *Takahashi*, 334 U.S. at 419).  Acting consistent with Congress's scheme, and at its invitation, Hawai'i's law cannot "encroach upon exclusive federal power." *Id.* at 380.

Nor does Hawai'i's scheme violate Congress's dormant immigration powers.  There is no reason for federal courts to intervene here to defend Congress's power over immigration and naturalization.  Congress drew the lines clearly: there are classes of aliens who may come to the United States and must be treated on the same basis as if they were citizens; there are other classes of aliens—those who have not come to our shores lawfully—who may not receive such benefits, even if the states were otherwise disposed to afford them our largesse.  Finally, there is the third class of aliens—including those entering the United States lawfully under COFA—for whom Congress has determined that the states need not treat them as citizens, but may do so at the state's discretion. Where Congress has made such a determination, the courts should only second-guess that judgment if Congress itself has overstepped its constitutional authority.  I do not believe there is any basis for that theory.

B

If we follow a pure equal protection model, it is unlikely that Hawai'i's scheme can muster constitutional scrutiny. Following *Graham*, Hawai'i's law discriminates between citizens and aliens, and, for that reason (as the district court correctly pointed out), Hawai'i must satisfy strict scrutiny. Hawai'i will have to show that it has a compelling state interest in treating resident aliens differently from citizens, and even if it can show such an interest, it will have to prove that it has narrowly tailored its program. Hawai'i can likely offer two interests. First, it adopted its law because of budgetary reasons. This has never been thought to be a sufficient reason to justify discrimination that is subject to increased judicial scrutiny. *See Mem'l Hosp. v. Maricopa Cnty.*, 415 U.S. 250, 263 (1974) ("[A] State may not protect the public fisc by drawing an invidious distinction between classes of its citizens"); *Graham*, 403 U.S. at 375 ("[A] concern for fiscal integrity is not compelling."); *Shapiro v. Thompson*, 394 U.S. 618, 633 (1969) ("a State has a valid interest in preserving the fiscal integrity of its programs. . . . But a State may not accomplish such a purpose by invidious distinctions between classes of its citizens."); *see also Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 547–49 (2001). Second, Hawai'i can point to PRWORA itself and Congress's declaration that a state that "follow[s] the Federal classification in determining the eligibility of . . . aliens for public assistance shall be considered to have chosen the least restrictive means available for achieving the compelling government interest of assuring that aliens be self-reliant in accordance with national immigration policy." 8 U.S.C. § 1601(7). Despite the appeal of Congress's finding, this is not likely a sufficient justification. In *Graham*, the Court made clear that "Congress does not have the power to

authorize the individual States to violate the Equal Protection
Clause." 403 U.S. at 382. More importantly, the Court has
previously held that, whatever reasons the federal government
may offer for its own discrimination policy, the states cannot
rely on that same justification. The states must supply their
own sovereign reasons and cannot cite the reasons of a
coordinate government. *See City of Richmond v. J.A. Croson
Co.*, 488 U.S. 469, 504 (1989) ("Congress has made national
findings that there has been societal discrimination in a host
of fields. If all a state or local government need do is find a
congressional report on the subject to enact a set-aside
program, the constraints of the Equal Protection Clause will,
in effect, have been rendered a nullity."). In sum, if we
looked exclusively to equal protection principles, I think it is
likely that Hawai'i's law would fall.

V

The equal protection principle announced in *Graham* has
proven unsustainable. In the end, I think that preemption
analysis will prove more consistent with the text and structure
of the Constitution, the Court's pre-*Graham* cases, and even
with the history of the Fourteenth Amendment itself.[8] Were

---

[8] Nothing I have said here should diminish in any way the fact that
aliens are "persons" entitled to the protection of the Due Process and
Equal Protection Clauses of the Fourteenth Amendment and the Due
Process Clause—including its equal protection component—of the Fifth
Amendment. *See Takahashi*, 334 U.S. at 410; *Truax*, 239 U.S. at 33. But
the tension evident in the Court's post-*Graham* cases is a consequence of
the Court's efforts to reconcile the Equal Protection Clause with a
recognition that there are common law and constitutional distinctions
between the rights of citizens and the rights of aliens visiting or residing
in the United States.

it within my power, I would adopt preemption analysis as the appropriate analysis for evaluating the alienage cases. Because I am bound by *Graham* and the cases that follow it, I join Judge McKeown's opinion for the court.

---

The Fourteenth Amendment, of course, took account of these differences in the Privileges and Immunities Clause, which provided that the "privileges or immunities of *citizens* of the United States" could not be abridged, and in the Due Process and Equal Protection Clauses, which applied to "any *person*." The current confusion is due in no small part to the Court's disastrous decision in The *Slaughter-House Cases*, 83 U.S. (16 Wall.) 36 (1873). In that case, as Justice Field pointed out, the Court effectively read the Privileges or Immunities Clause out of the Fourteenth Amendment, rendering the Clause a "vain and idle enactment, which accomplished nothing, and most unnecessarily excited Congress and the people on its passage." *Id.* at 96 (Field, J., dissenting). Understandably, to compensate, the Court later invigorated the Equal Protection and Due Process Clauses, which had narrower purposes, but applied more broadly to all "persons." *See McDonald v. City of Chicago*, 130 S. Ct. 3020, 3029–31 (2010). The Court's treatment of aliens under the Equal Protection Clause has been, in large measure, both counter-textual and counter-historical. *See* David P. Currie, *The Constitution in the Supreme Court: The First Hundred Years, 1789–1888*, at 342–50, 387 & n.133 (1985); John Harrison, *Reconstructing the Privileges or Immunities Clause*, 101 Yale L.J. 1385, 1390, 1442–47 (1992); Earl M. Maltz, *The Constitution and Nonracial Discrimination: Alienage, Sex, and the Framers' Ideal of Equality*, 7 Const. Comment 251, 257–65 (1990).

CLIFTON, Circuit Judge, dissenting:

The Equal Protection Clause of the Fourteenth Amendment provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. It is settled law that alienage is a suspect class and that state laws that discriminate against aliens who are lawfully present in this country generally violate the Equal Protection Clause unless they can withstand strict scrutiny.[1]

In this case, the State of Hawai'i discriminated against aliens from three Micronesian nations who were lawfully present in this country, based on the terms of Compacts of Free Association those nations entered with the United States ("COFA Residents"), by limiting the state-funded health benefits available to them. The state could provide to them the same benefits it provides to citizens. It had, in fact, provided the same benefits to COFA Residents for fourteen years, until budgetary woes motivated the state to try to save money, by exercising an option given to it by Congress.

---

[1] *See Graham v. Richardson*, 403 U.S. 365, 371–72 (1971); *see also Bernal v. Painter*, 467 U.S. 216, 219 (1984); *Nyquist v. Mauclet*, 432 U.S. 1, 7 (1977); *Examining Bd. of Eng'rs, Architects & Surveyors v. Flores de Otero*, 426 U.S. 572, 602 (1976); *In re Griffiths*, 413 U.S. 717, 721 (1973); *Sugarman v. Dougall*, 413 U.S. 634, 642 (1973); *cf. Takahashi v. Fish & Game Comm'n*, 334 U.S. 410, 420 (1948) (applying equal protection principles to discrimination against aliens and striking down state ban on aliens' commercial fishing). There are two exceptions to the application of strict scrutiny not relevant to this case. *See Toll v. Moreno*, 458 U.S. 1, 12 n.17 (1982) (outlining the self-government exception); *Plyler v. Doe*, 457 U.S. 202, 223–24 (1982) (holding that discrimination against illegal aliens is subject only to intermediate scrutiny).

But the state's fiscal condition does not provide the compelling justification required under the Equal Protection Clause to justify unequal treatment of aliens. The option given to the states by Congress to decide whether to treat aliens differently was illusory, under established Supreme Court precedent. Congress has broad power, based on its authority over immigration and foreign relations, to decide whether to treat aliens differently than citizens, but Congress does not have the power to assign that discretion to states. As explained by the Supreme Court, "Congress does not have the power to authorize the individual States to violate the Equal Protection Clause." *Graham v. Richardson*, 403 U.S. 365, 382 (1971). When the State of Hawai'i exercised the option given to it by Congress, it discriminated against aliens without a compelling justification. In my view, that violated the Equal Protection Clause. I respectfully dissent.

## I.  Disparity in Expenditure of State Funds

The majority opinion most obviously goes astray when it suggests that Plaintiffs have failed to establish a claim of disparity because they have not claimed that Hawai'i's per capita expenditures of state funds differ as between citizens and COFA Residents. Maj. Op. at 23 & n.8. The majority thus appears to require that, in order to establish a claim of disparate treatment, a class alleging discrimination under the Equal Protection Clause must demonstrate that the state is expending less funds, on a per capita basis, than it is spending on the rest of the population. In effect, the majority requires Plaintiffs to allege (and eventually, I presume, to prove) that they have been shortchanged on a per capita basis. Because Plaintiffs have not so alleged, the majority harbors serious doubts that Plaintiffs have made out a claim of an equal

protection violation by the state. That approach is wrong in two separate ways.

First, it treats Medicaid as if it consisted of two separate programs, one federal and one state, because the program is partially funded by the federal government. But that is not how Medicaid actually works. In Hawaiʻi, as in most states, there is a single plan, administered by the state. The federal government reimburses the state for a significant portion of the cost, and the plan must comply with federal requirements, but it is a state plan. The majority opinion's own description of the program, at 5, confirms as much. Beneficiaries are not covered by two separate federal and state plans, but rather by one single plan administered by the state.

Second, and more importantly, the approach suggested by the majority opinion runs afoul of bedrock equal protection doctrine dating back at least to *Brown v. Board of Education*, 347 U.S. 483 (1954). The majority opinion would allow a state to treat a class of aliens differently as long as the state's financial outlay for Plaintiffs and other members of the suspect class is the same, on a per capita basis, as the state's expenditures for the rest of the population. But that does not change the fact that Hawaiʻi has treated aliens differently by placing COFA Residents in a program with reduced benefits. That action constitutes disparate treatment in violation of the Equal Protection Clause. The disparate treatment is not immunized because the per capita expenditures might be the same. "Separate but equal" is not permitted.

The approach of the majority opinion could justify a state reducing benefits provided to members of a particular group on the ground that providing benefits to that group is more expensive than providing the same benefits to the general

population. For example, a state could reduce chemotherapy and radiation therapy benefits for African Americans and justify this discrimination by citing African Americans' increased susceptibility to various types of cancer.[2] That state could argue that, despite the reduced benefits available to any single individual, its average per capita expenditures for African Americans were not less than the expenditures for the rest of the population.

Such a "separate but equal" approach runs counter to the dictates of *Brown v. Board of Education*. "The point of the equal protection guarantee is not to ensure that facially discriminatory laws yield roughly equivalent outcomes . . . . Rather, the right to equal protection recognizes that the act of classification is itself invidious and is thus constitutionally acceptable only where it meets an exacting test." *Finch v. Commonwealth Health Ins. Connector Auth.*, 946 N.E.2d 1262, 1278 (Mass. 2011).

I don't really think the majority opinion is trying to return to the era of separate but equal. Although it denies the existence of a claim of disparity vis-a-vis state action, the majority opinion nevertheless proceeds to assume *arguendo* the existence of such a claim and subjects Hawai'i's actions to review under the Equal Protection Clause, albeit based on a rational basis standard. *See* Maj. Op. at 23–24. If there really were no disparity attributable to the State of Hawai'i, as the majority argues, the Equal Protection Clause would simply be inapplicable, and no further judicial review would be required. By discussing the equal protection framework

---

[2] *See, e.g.*, *Cancer and African Americans*, U.S. Dep't of Health & Human Servs. Office of Minority Health, http://minorityhealth.hhs.gov/templates/content.aspx?ID=2826 (last updated Sept. 11, 2013).

established by *Graham v. Richardson*, 403 U.S. 365 (1971), and *Mathews v. Diaz*, 426 U.S. 67 (1976), and applying rational basis review to uphold Hawaiʻi's discriminatory health welfare programs, the majority tacitly acknowledges that a claim for discrimination based on disparate treatment does not require proof of disparate per capita expenditure of funds.  But it shouldn't even start down that road.

## II. Hawaiʻi's Decision to Reduce Benefits for COFA Residents

The main thrust of the majority opinion, as I understand it, is that Hawaiʻi's actions are subject only to rational basis review under the Equal Protection Clause, rather than strict scrutiny, because those actions were authorized by Congress. Here again, the majority fails to heed well established Supreme Court precedent.

We must decide this case under the equal protection framework established by the Supreme Court in *Graham* and *Mathews*. The equal protection holdings in those cases are clear, and the majority opinion ably summarizes them, at 13–17. In brief, *Graham* requires that we review state discrimination against aliens under strict scrutiny, while *Mathews* requires that we review federal discrimination against aliens under rational basis review, because of the federal government's broad powers in the area of immigration and foreign relations. The question this case thus turns on is whether the denial of equal benefits to COFA Residents is ultimately the responsibility of the state or of Congress.

I conclude that it is the State of Hawaiʻi that is ultimately responsible. The majority reaches a different conclusion, permitting it to uphold Hawaiʻi's program under rational

basis review, by obscuring the role states play within the statutory framework established by Congress.

The majority repeatedly emphasizes that Hawai'i is following the federal direction and that states are given only limited discretion to decide which aliens to provide benefits to under the Welfare Reform Act. But there is no federal direction regarding how to treat COFA Residents and others within what the majority describes as the Welfare Reform Act's third category of aliens. The statute gives states discretion to decide whether or not to provide health benefits to persons within that category.[3] *See* 8 U.S.C. §§ 1621–1622; Maj. Op. at 7–9.

In making the decision not to provide equal benefits to COFA Residents, Hawai'i has necessarily made a distinction on the basis of alienage: a similarly situated *citizen* is eligible to receive more benefits. Because Hawai'i has classified COFA Residents on the basis of alienage, the Equal Protection Clause requires that we strictly scrutinize Hawai'i's actions to ensure that they are "narrowly tailored measures that further compelling governmental interests." *Johnson v. California*, 543 U.S. 499, 505 (2005) (quoting *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 227 (1995)).

---

[3] In fact, the statute gives discretion regarding how to treat aliens within the *second* category as well, notwithstanding the majority's description of that category as that of "aliens for whom states *must not* provide *any* state benefits," Maj. Op. at 18 (emphases added). The Welfare Reform Act allows states to provide benefits to this category of aliens "through the enactment of a State law after August 22, 1996, which affirmatively provides for [those aliens'] eligibility." 8 U.S.C. § 1621(d).

That federal discrimination against aliens would be subject only to rational basis review is irrelevant. We are presented with a case not of *federal* discrimination, but one of *state* discrimination. It is undisputed that COFA Residents are not eligible for federal benefits and that Hawai'i thus cannot obtain federal reimbursements for expenses incurred to cover COFA Residents under Hawai'i's Medicaid programs.[4] *See* 8 U.S.C. §§ 1611, 1641. But it is also undisputed that Hawai'i remains free to cover COFA Residents under its Medicaid programs, so long as it uses only state funds—something Hawai'i did for fourteen years, from the time of the enactment of the Welfare Reform Act in 1996 until 2010. *See id.* §§ 1621–22. In 2010, based on COFA Residents' status as aliens, Hawai'i cut them off from its Medicaid programs and placed them in the reduced-benefits BHH program.[5] *See* Haw. Admin. Rules (HAR) §§ 17-1714-28, 17-1722.3-7. Hawai'i's actions thus classify on the basis of alienage and are subject to strict scrutiny.

In effect, through the Welfare Reform Act, I think Congress has given states a lit firecracker, at risk of exploding when a state exercised its discretion to discriminate on the basis of alienage. It was Hawai'i's decision not to

---

[4] "Medicaid programs" refers to the managed care programs Hawai'i has operated since 1993, pursuant to a waiver approved by the federal government under section 1115 of the Social Security Act. These programs include QUEST, QUEST-Net, QUEST Adult Coverage Expansion, and QUEST Expanded Access.

[5] Because the BHH program has a capped enrollment, HAR § 17-1722.3-10, and more COFA Residents were moved from the Medicaid programs to BHH than would normally be allowed under the cap, new COFA Residents moving to Hawai'i after 2010 may not be covered under *any* state medical welfare program.

cover COFA Residents under its Medicaid programs that effected the discrimination in this case. "Insofar as state welfare policy is concerned, there is little, if any, basis for treating persons who are citizens of another State differently from persons who are citizens of another country." *Mathews*, 426 U.S. at 85 (footnote omitted). "The States enjoy no power with respect to the classification of aliens. This power is 'committed to the political branches of the Federal Government.'" *Plyler*, 457 U.S. at 225 (citation omitted) (quoting *Mathews*, 426 U.S. at 81). And, as I will discuss below, this is not a power the federal government can delegate to the states.

## III. A Tale of Three Clauses: Equal Protection, Preemption, and the Immigration and Naturalization Power

The principles just articulated lead me to the majority's final reason for upholding Hawai'i's discriminatory actions: its conflation of the Supreme Court's equal protection holdings in *Graham* and *Mathews* with the distinct *preemption* holding in *Graham*. As explained above, in the equal protection arena, *Graham* stands for the proposition that strict scrutiny applies to state laws classifying on the basis of alienage, and *Mathews* stands for the proposition that rational basis review applies to similar *federal* laws. As a case interpreting the Supremacy Clause, *Graham* is part of the line of cases that establishes federal supremacy in the area of immigration and naturalization, as the concurrence by Judge Bybee explains, at 20–27. *See Graham*, 403 U.S. at 376–80; *see also, e.g.*, *Arizona v. United States*, 132 S. Ct. 2492, 2498–501 (2012) (outlining the preemption principles applicable in the area of immigration and naturalization).

In this case, no one argues that Hawaiʻi's actions are preempted by the Welfare Reform Act. Preemption doctrine has no bearing on the outcome here. Congress has authorized Hawaiʻi to exclude COFA Residents from the state Medicaid programs, *see* 8 U.S.C. § 1622, so there is no conflict between the state's action and the Welfare Reform Act.

The crux of the question is not whether Hawaiʻi has adhered to the requirements prescribed by Congress in the Welfare Reform Act—it has, and no one argues that it has not—but rather whether Hawaiʻi could constitutionally take the action it took "as part and parcel of the federal welfare scheme." Maj. Op. at 25 n.10. I submit that we should answer this question in the negative, following precedent from both the Supreme Court and our own court.

*Graham* stated that:

> Although the Federal Government admittedly has broad constitutional power to determine what aliens shall be admitted to the United States, the period they may remain, and the terms and conditions of their naturalization, Congress does not have the power to authorize the individual States to violate the Equal Protection Clause. *Shapiro v. Thompson*, 394 U.S., at 641, 89 S. Ct., at 1335. Under Art. I, § 8, cl. 4, of the Constitution, Congress' power is to 'establish an uniform Rule of Naturalization.' A congressional enactment construed so as to permit state legislatures to adopt divergent laws on the subject of citizenship requirements for federally supported welfare

programs would appear to contravene this explicit constitutional requirement of uniformity.

403 U.S. at 382; *see also Saenz v. Roe*, 526 U.S. 489, 508 (1999) ("Congress has no affirmative power to authorize the States to violate the Fourteenth Amendment and is implicitly prohibited from passing legislation that purports to validate any such violation.").

We previously relied on this passage in holding that a federal statute that requires states to grant benefits to citizens and certain aliens while also requiring states to *deny* benefits to other aliens did not authorize the states to violate the Equal Protection Clause, because "Congress ha[d] enacted a *uniform* policy regarding the eligibility of [certain aliens] for welfare benefits." *Sudomir v. McMahon*, 767 F.2d 1456, 1466 (9th Cir. 1985). As such, we stated that "[t]his makes inapplicable the suggestion in *Graham v. Richardson* that *Shapiro* may require the invalidation of congressional enactments permitting states to adopt divergent laws regarding the eligibility of aliens for federally supported welfare programs." *Id.* at 1466–67 (citation omitted).

Both the Supreme Court and this court recognize that uniformity is required for any congressional enactment regulating immigration and the status of aliens, because Congress's power over immigration and naturalization matters derives from the Naturalization Clause, which grants Congress the power "[t]o establish an uniform Rule of Naturalization." U.S. Const. art. I, § 8, cl. 4. The majority opinion makes an effort to argue that the uniformity requirement is inapplicable here because the original motivations for the Naturalization Clause centered around

avoiding a scenario that had plagued the Articles of Confederation, whereby a naturalization decision made by one state with respect to aliens within its territory was binding on other states. Maj. Op. at 18–19 (citing *Soskin v. Reinertson*, 353 F.3d 1242, 1257 (10th Cir. 2004)). However, the majority also appears to recognize that, whatever the original intent of the Naturalization Clause's uniformity requirement may have been, it applies to this case. *See id.*

The majority minimizes the significance of the divergent Medicaid eligibility requirements allowed through the discretion the Welfare Reform Act gives to the states. *See id.* at 19 ("The limited discretion authorized . . . does not undermine the uniformity requirement of the Naturalization Clause."); *id.* at 20 ("[A] state's limited discretion to implement a plan . . . does not defeat or undermine uniformity."). In reaching this conclusion, the majority relies on the Supreme Court's reading of the Bankruptcy Clause's uniformity requirement. *See id.* at 21–22.

Unfortunately, the majority's analogy to the Bankruptcy Clause does not fit. The analogy fails to recognize the crucially important counterweight the Equal Protection Clause provides against the constitutional grant of power—a counterweight present in this case but absent from the bankruptcy arena.

The grants of power in Article I with respect to naturalization and bankruptcy are very similar. Indeed, the Naturalization Clause and the Bankruptcy Clause are listed together in a single clause within Article I, section 8, which grants Congress the power "[t]o establish an uniform Rule of Naturalization, and uniform Laws on the subject of Bankruptcies throughout the United States." U.S. Const. art.

I, § 8, cl. 4. It is also true that the Supreme Court has interpreted the uniformity requirement in the Bankruptcy Clause to allow for the incorporation of divergent state laws within the Bankruptcy Act. *See* Maj. Op. at 20 (citing, among others, *Hanover National Bank v. Moyses*, 186 U.S. 181 (1902)).

The Naturalization Clause and the Bankruptcy Clause are simply grants of power to Congress, however. They do not *require* Congress to pass federal naturalization and bankruptcy laws. The first federal naturalization law, Act of Mar. 26, 1790, ch. 3, 1 Stat. 103, was passed right away, by the First Congress, likely to avoid the serious difficulties presented by the states' divergent laws on the subject under the Articles of Confederation. The first federal bankruptcy law was not passed for more than a decade, until 1800, Act of Apr. 4, 1800, ch. 19, 2 Stat. 19.

That the majority relies so heavily on the constitutional grants of power contained in Article I is thus particularly problematic. If there were no federal bankruptcy law (as was the case for the first eleven years of our nation's Constitution), it is clear that the states could adopt their own bankruptcy laws, crafting their creditor-debtor relationships as they wished, advantaging some creditors and debtors over others, so long as the states' laws were rational.

Not so for immigration and naturalization. It would not be the case that, if there were no federal immigration and naturalization laws dealing with the United States' relations with aliens, the states would be free to craft their own laws, advantaging citizens and some aliens over other aliens. The Equal Protection Clause would prevent them from doing so,

given the strict scrutiny applied to distinctions by states between aliens and citizens under *Graham*.

It is this crucial interaction between the Article I grant of power and the Equal Protection Clause that the majority opinion neglects, which leads it to its unpersuasive conclusion that the discretion given to the states by the Welfare Reform Act does not undermine uniformity. That conclusion rests on the separate preemption doctrine that is not part of this case and does not come to grips with the dictates of the Equal Protection Clause.

Consider the following hypothetical. Congress passes and the President signs a new law, the Alien Discrimination Act. In it, Congress authorizes states to classify aliens in any manner that is not wholly irrational. To justify the Act, Congress articulates a uniform policy of devolving more traditionally state police powers to the states.[6] As a preemption matter, this Act would remove any obstacles to state legislation on the subject. But could the states then discriminate against aliens subject only to rational basis review under the Equal Protection Clause? The answer must surely be "no," if we are to heed *Graham*'s statement that "Congress does not have the power to authorize the individual States to violate the Equal Protection Clause." 403 U.S. at 382. Strict scrutiny must still apply in this hypothetical. The majority opinion, at 24, describes that statement in *Graham* as "almost tautological" and proceeds to treat it as if it were not there, taking the view that as long

---

[6] This uniform federal policy would follow the principle of "New Federalism," a principle which also underlies the Welfare Reform Act. *See, e.g.*, Steven D. Schwinn, *Toward a More Expansive Welfare Devolution Debate*, 9 Lewis & Clark L. Rev. 311, 312–13 (2005).

as Congress clearly expresses its will, it can authorize individual states to discriminate against aliens.[7] Though I may have sympathy for the position of the State of Hawai'i, see below at 70–71, I would not so freely disregard the Supreme Court's explicit pronouncements.

The "limited" nature of the discretion to discriminate the states are given under the Welfare Reform Act is irrelevant: the Act still authorizes states to discriminate against some aliens in the provision of some welfare benefits, and thus authorizes them to violate the Equal Protection Clause. Therefore, in this case as in the hypothetical above, strict scrutiny must apply.

My conclusion does not detract from *Sudomir*'s requirement that states cannot be compelled to replace federal funding where the federal statute *requires* states to discriminate against aliens. 767 F.2d at 1466. In such cases, the states are merely "follow[ing] the federal direction." *Plyler v. Doe*, 457 U.S. 202, 219 n.19 (1982).

In this case, though, there is no federal direction for states to follow. The ultimate decision is left up to each state. Congress articulated what the majority argues are uniform

---

[7] The majority opinion also states that I am asking the wrong question, but its own language underscores its confusion as to whether this is an equal protection or a preemption case. The majority would have me ask "not whether Congress may authorize Hawai'i to violate the Equal Protection Clause but rather 'what constitutes such a violation when Congress has (clearly) expressed its will regarding a matter relating to aliens.'" Maj. Op. at 24 (quoting *Soskin*, 353 F.3d at 1254). I know of no equal protection doctrine that turns on whether "Congress has (clearly) expressed its will." That is instead the language of preemption analysis. *See, e.g.*, *Wyeth v. Levine*, 129 S. Ct. 1187, 1194–95 (2009).

policies in the Welfare Reform Act, including a policy "to assure that aliens be self-reliant in accordance with national immigration policy," 8 U.S.C. § 1601(5), and "to remove the incentive for illegal immigration provided by the availability of public benefits," *id.* § 1601(6). Those policies would presumably support a flat prohibition on providing benefits to aliens or to a specified group of aliens. Congress did not enact a prohibition, though. The decision as to how a given group of aliens is to be treated is simply left to each state. In light of the broad discretion it gives to the states, the Act simply does not provide a federal direction with regard to COFA Residents and others in the third category of aliens. It does not require or forbid the states to do anything.

Although the majority opinion argues, at 15, that Hawai'i followed a federal direction by shunting COFA Residents into the BHH program, it could also be said that Hawai'i followed a federal direction during the fourteen years when it included COFA Residents in its Medicaid programs. A federal "direction" that points in two opposite ways is not a direction. We have already recognized as much. *See Pimentel v. Dreyfus*, 670 F.3d 1096, 1109 (9th Cir. 2012) (per curiam) ("[T]he Welfare Reform Act did not establish a uniform rule with respect to state welfare programs. . . ."); *see also, e.g.*, *Ehrlich v. Perez*, 908 A.2d 1220, 1240–41 (Md. 2006) (holding that the Welfare Reform Act's "laissez faire . . . approach to granting discretionary authority to the States in deciding whether to continue State-funded medical benefits" for certain aliens does not amount to a "single, uniform, and articulated directive").

In the Welfare Reform Act, Congress itself recognized that, far from providing a uniform federal direction, it was giving states broad discretion to discriminate against aliens in

the provision of welfare benefits. This recognition comes through in Congress's statement of policy emphasizing that the states exercising their discretion to determine some aliens' eligibility for welfare benefits "shall be considered to have chosen the least restrictive means available for achieving the compelling governmental interest of assuring that aliens be self-reliant in accordance with national immigration policy." 8 U.S.C. § 1601(7). But Congress does not have the power to give states discretion to discriminate.

## IV.    Conclusion

Though the majority opinion asserts that I am inviting a circuit split, I note that it is the majority opinion that is contrary to the opinions of a majority of courts that have considered this question. Only one other circuit has spoken, in *Soskin v. Reinertson*, 353 F.3d 1242 (10th Cir. 2004), and that is the only decision consistent with the majority opinion. For the reasons discussed above, as well as for the reasons Judge Henry articulated in his dissent, I believe that *Soskin* was wrongly decided, under current Supreme Court precedent. *See Soskin*, 353 F.3d at 1265 (Henry, J., dissenting). Against *Soskin* lie three decisions of the high courts of Maryland, Massachusetts, and New York. *Ehrlich v. Perez*, 908 A.2d 1220 (Md. 2006); *Finch v. Commonwealth Health Ins. Connector Auth.*, 946 N.E.2d 1262 (Mass. 2011); *Aliessa ex rel. Fayad v. Novello*, 754 N.E.2d 1085 (N.Y. 2001). All three decisions applied strict scrutiny under the Equal Protection Clause to strike down state statutes that purported to exclude certain aliens from Medicaid because they were aliens. *See Ehrlich*, 908 A.2d at 1243; *Finch*,

946 N.E.2d at 1280;**[8]** *Aliessa*, 754 N.E.2d at 1098. The majority opinion's application of equal protection rational basis review to state action thus stands against the weight of authority.

Even though in my view Plaintiffs should prevail, I acknowledge there is something paradoxical and more than a little unfair in my conclusion that the State of Hawai'i has discriminated against COFA Residents. The state responded to an option given to it by Congress, albeit an option that I don't think Congress had the power to give. Hawai'i provided full Medicaid benefits to COFA Residents for many years, entirely out of its own treasury, because the federal government declined to bear any part of that cost. Rather than terminate benefits completely in 2010, Hawai'i offered the BHH program to COFA Residents, again from its own pocket. The right of COFA Residents to come to Hawai'i in the first place derives from the Compacts of Free Association that were negotiated and entered into by the federal government. That a disproportionate share of COFA Residents, from Pacific island nations, come to Hawai'i as compared to the other forty-nine states is hardly a surprise, given basic geography. The decision by the state not to keep paying the full expense of Medicaid benefits for those aliens is not really a surprise, either. In a larger sense, it is the

---

**[8]** Although *Finch* speaks in terms of the Massachusetts Constitution's right to equal protection, the Massachusetts Supreme Judicial Court has interpreted that state provision to be coextensive with the federal Equal Protection Clause in matters concerning aliens. *See, e.g.*, *Doe v. Comm'r of Transitional Assistance*, 773 N.E.2d 404, 408 (Mass. 2002). Accordingly, *Finch*'s analysis relies heavily on United States Supreme Court decisions interpreting the Equal Protection Clause. *See* 946 N.E.2d at 1273–80.

federal government, not the State of Hawai'i, that should be deemed responsible.

But the federal government is permitted to discriminate against aliens in a way that the state government is not. Because established precedent should require us to apply strict scrutiny to Hawai'i's exclusion of COFA Residents from the Medicaid programs, and no one seriously contends that Hawai'i's actions can withstand such strict scrutiny, I respectfully dissent.